UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**FILED**

03 OCT -2 PM 4:34

OCT 8 2003

U.S. DISTRICT COURT

MICHAEL W DOBBINS, CLERK, U.S. DISTRICT COURT

GENEROSO TROMBETTA )
)
Plaintiff, )
)
v. ) No. 02 C 5895
)
)
BOARD OF EDUCATION, PROVISO TOWNSHIP ) Judge Kennelly
HIGH SCHOOL DIST. 209, COOK COUNTY, )
ILLINOIS; THERESA L. KELLY; EMANUEL ) Magistrate Judge Ashman
"CHRIS" WELCH; DANIEL J. ADAMS; )
MICHAEL J. CARLSON; RONALD SERPICO; and )
GREGORY T. JACKSON )
)
) **DOCKETED**
Defendant. )
OCT 1 4 2003

## PLAINTIFF'S RESPONSE TO DEFENDANT SERPICO'S STATEMENT OF MATERIAL FACTS

Plaintiff Generoso Trombetta ("Trombetta"), by his attorneys and pursuant to Fed. R. Civ.

P. 56 and Local Rule 56.1(a)(3), states that there are material facts in dispute and responds as

follows:

### NATURE OF THE ACTION

1.      Plaintiff, Generoso ("Gino") Trombetta, brought suit against the Board of Education
of Proviso Township High School District No. 209, Cook County, Illinois ("School District" or
"District 209"); Theresa L. Kelly; Emanuel "Chris" Welch; Daniel J. Adams; Michael J. Carlson;
Ronald Serpico; and Gregory T. Jackson arising out of the plaintiff's termination of employment on
April 18, 2002. (Plaintiff's First Amended Complaint ["Complaint"], attached hereto as Exhibit 1).

**RESPONSE**: Undisputed except that while the Board voted to terminate Trombetta on

April 18, 2002, Plaintiff was, in fact, terminated on April 12, 2002. Generoso Trombetta 5/20/03



1

Dep. 238-240 ("Trombetta 5/20/03 Dep.)(attached as Ex. V);[1] Gregory Jackson 7/24/03 Dep. 275-76

("Jackson 7/24/03 Dep.")(attached as Ex. K); William Krause Dep. 52-53 ("Krause Dep.")(attached

as Ex. N); Pl.'s Resp. Defs.' Interrog. #5 (attached as Ex. WW). The cited evidence states that

Trombetta was wrongfully terminated on April 12, 2002. First Amended Complaint, ¶ 4.[2]

     2.    Plaintiff brought suit against the defendants, seeking damages under 42 U.S.C. § 1983 for the alleged violations of his constitutional rights. Plaintiff also advances numerous pendent claims for relief predicated upon the law of the State of Illinois. Specifically, plaintiff alleges that defendants conspired to discharge him from public employment without due process and in retaliation for his exercise of free speech and association, including his political support for Michael A. Manzo and opposition to defendant Mayor Ronald Serpico in the 2001 election for the office of Mayor for the Village of Melrose Park, all in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiff also alleges that defendants' actions in breaching and interfering with plaintiff's employment contract violated state law. (Complaint, ¶ 1).

    **RESPONSE:**    Undisputed except that Plaintiff did not allege "numerous pendent

claims for relief predicated upon the law of the State of Illinois." In his First Amended Complaint,

Plaintiff alleged two state law claims (breach of contract and tortious interference with contract).

Complaint ¶¶ 44-47.

### THE PARTIES

     3.    Plaintiff Generoso Trombetta ("Trombetta") is a resident in Roselle, Illinois. He was employed as Building Manager for Proviso East High School ("Proviso East") by the Board of Education for District 209 ("School Board") from April, 2000 until April, 2002. (Complaint, ¶ 4). Trombetta was the campaign manager and political supporter of his cousin, Michael A. Manzo ("Manzo"), for the April 2001 election for Mayor of Melrose Park. Id.

    **RESPONSE:**    Undisputed.

     4.    Defendant Proviso School Board is an Illinois municipal corporation organized

---

[1]The cited materials are contained in Plaintiff's Appendix of Exhibits in Opposition to Defendants' Motions for Summary Judgment, which is filed herewith.

[2]To the extent Plaintiff states that Defendant Serpico's Proposed Facts ("Def.'s Facts") are undisputed, he does so only for purposes of Defendant's Motion for Summary Judgment.

pursuant to the Illinois School Code. (Complaint, ¶ 5).

**RESPONSE:**     Undisputed.

5.     Defendant Theresa L. Kelly ("Kelly") is currently a member of the School Board. (Complaint, ¶ 6).

**RESPONSE:**     Undisputed.

6.     Defendant Emanuel "Chris" Welch ("Welch") is currently a member of the School Board. (Complaint, ¶ 7).

**RESPONSE:**     Undisputed.

7.     Defendant Daniel J. Adams ("Adams") is currently a member of the School Board. (Complaint, ¶ 8).

**RESPONSE:**     Undisputed.

8.     Defendant Michael J. Carlson ("Carlson") is currently a member of the School Board. (Complaint, ¶ 9).

**RESPONSE:**     Undisputed.

9.     Defendant Ronald Serpico ("Serpico") is the Mayor of the Village of Melrose Park. (Complaint, ¶ 10).

**RESPONSE:**     Undisputed.

10.     Defendant Gregory T. Jackson ("Jackson") is currently Superintendent of District 209. (Complaint, ¶ 11).

**RESPONSE:**     Undisputed.

## VENUE AND JURISDICTION

11.     Jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 1983. (Complaint, ¶ 1). As such, this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. Further, because plaintiff alleges claims under Illinois state law, this Court could exercise its supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

**RESPONSE:**     Undisputed.

3

12.     Venue is proper pursuant to 28 U.S.C. § 1391 because the events giving rise to plaintiff's claims occurred in this judicial jurisdiction.

**RESPONSE:**          Undisputed.

## PROCEDURAL HISTORY

13.     On or about November 4 and 19, 2002, the school defendants and defendant Serpico, respectively, filed motions to dismiss plaintiff's first amended complaint. This Court granted defendants' motions in part. (See, court order dated March 13, 2003, attached hereto as Exhibit 2, dismissing Counts IV and V of plaintiff's first amended complaint).

**RESPONSE:**          Undisputed. This Court denied Defendants' motions to dismiss as to

Counts I-III. See 11/7/02 and 11/19/02 Minute Orders. This Court granted Defendants' motions to

dismiss Trombetta's state law claims. See 3/13/03 Opinion & Order.

14.     Thus, the remaining claims in this litigation are as follows:

Count I          First Amendment claim under § 1983 against all defendants;

Count II         Conspiracy claim to violate plaintiff's rights under the First Amendment under § 1983 against all defendants;

Count III        Procedural due process claim under the Fourteenth Amendment under § 1983 against all defendants *except* defendant Serpico.

Defendant Serpico now moves for summary judgment on Counts I and II of plaintiff's first amended complaint.

## STATEMENT OF FACTS

15.     Trombetta was hired to be the Director of Buildings and Grounds (also known as the Building Manager) at Proviso East High School ("East") in District 209 in April, 2000. (Complaint, ¶ 12). His hiring resulted from a reorganization of the Maintenance Department around that time that was implemented by the School Board ("the Board") a few months before. (Jackson Part I dep. tr. 30-31, attached hereto as Exhibit 3). The President of the Board at the time of the reorganization was Mike Manzo. (Manzo dep. tr. 96, attached hereto as Exhibit 4; Jackson Part I dep. tr. 30). Trombetta is Mike Manzo's first cousin and the reorganization made room for his hiring. (Trombetta Part I dep. tr. 26-27, 30-31, attached hereto as Exhibit 5).

**RESPONSE:**      Disputed.  Plaintiff objects to Defendant Serpico's Proposed Fact ("Def.'s Fact") ¶ 15 on the grounds that it is not material, relevant or relied upon in support of Defendant's motion for summary judgment. *See* Def. Serpico's Mem. Supp. Motion for Summ. J. ("Def.'s Mem"). Trombetta was the Building Manager at Proviso East High School, not the manager of buildings and grounds.  Generoso Trombetta 4/22/03 Dep. 62-63 ("Trombetta 4/22/03 Dep.")(attached as Ex. V); Def. School Board's Supp. Resp. to Pl.'s Interrog. #4(e)(attached as Ex. CCC).  In December 1999, the Board (including Defendant Kelly) voted 6 to 0 in favor of authorizing the positions of Director of Facilities and Assistant Director of Facilities.  12/13/99 Minutes of Regular School Board Meeting (attached as Ex. GG).  In January 2000, upon the recommendation of Interim Superintendent Montoya-Kostro, the Proviso School Board voted 5 to 1 to promotion Fred Gianneschi to the position of Director of Facilities, and 6 to 0 (again including Defendant Kelly) to promote Larry Simone to the position of Assistant Director of Facilities. 1/24/00 Minutes of Regular Meeting at 16-17 (attached as Ex. HH).

Prior to Gianneschi's promotion, the position of Director of Facilities had been open for approximately 1½ years, and during that time, those responsibilities fell to Jackson, who was the Assistant Superintendent of Business Affairs at the time.  Michael Manzo Decl. ¶ 4 ("Manzo Decl.")(attached as Ex. AA); Gregory Jackson 5/29/03 Dep. 11, 24-25 ("Jackson 5/29/03 Dep.")(attached as Ex. K).  The positions of Director of Facilities and Assistant Director of Facilities were filled after Jackson (Assistant Superintendent of Business Affairs), Dale Crawford (Consultant to the Board), Rebecca Montoya-Kostro (Interim Superintendent), and the majority of School Board members concluded that they were necessary positions within the maintenance department.  Manzo Decl. ¶ 4.  Before being hired by School District 209 as Building Manager of Proviso East High

School, Trombetta applied for three positions at District 209 for which he was not hired. Generoso Trombetta Decl. ¶ 2 ("Trombetta Decl.")(attached as Ex. EE).

15.5          Shortly after Manzo became president of the Board in November, 1999, the Board (the "Manzo Board") decided to reorganize the Maintenance Department. Before the reorganization, there were two Building Managers, one for Proviso East High School ("Proviso East") and one for Proviso West High School ("Proviso West"). (Jackson Part I dep. tr. 18). Those Building Managers were Fred Gianneschi and Larry Simone, long-time employees of the District who had worked in many different capacities and had extensive knowledge of the physical plant and the administration of both buildings. (Jackson Part I dep. tr. 19). Both had much more experience, knowledge and background than Trombetta, as did the third supervisor in the department, Larry Simone. (Jackson Part I dep. tr. 48-49; Larry Simone dep. tr. 7-11, attached as Exhibit 6).

**RESPONSE:**          Plaintiff objects to Def's. Fact ¶ 15.5 on the basis that it is not material, relevant or relied upon in support of Defendant's motion for summary judgment. *See* Def.'s Mem. It is undisputed that the School Board did not terminate Trombetta for performance-related reasons. Emanuel Christ Welch Dep. 98 ("Welch Dep.")(attached as Ex. W). Further, it is disputed that Anthony Sullivan had much more experience than Trombetta. Trombetta 4/22/03 Dep. 10-25.

16.        Before the reorganization, oversight of the two Building Managers had for several years been handled by either Assistant Superintendent William Krause or then Business Manager (now Superintendent) Greg Jackson, ever since two administrative positions below him but above the Building Managers had become vacant for around two years. (Jackson Part I dep. tr. 21-22, 25, 30). Those positions were the Director of Facilities and Assistant Director of Facilities.

**RESPONSE:**          Plaintiff objects to Def's. Fact ¶ 16 on the basis that it is not material, relevant or relied upon in support of Defendant's motion for summary judgment. *See* Defs.' Mem. Further, Def.'s Fact ¶ 16 is disputed. Prior to the promotion of Gianneschi to Director of Facilities, the position of Director of Facilities had been vacant for about one year. Manzo Decl. ¶ 4. Prior to the time Gianneschi was promoted to Director of Facilities in 2000, Krause had no involvement in the maintenance department. Krause Dep. 20, 23.

17.        When the Manzo Board reorganized the Maintenance Department, it promoted Fred

Gianneschi from Building Manager at Proviso East into the vacant Director of Facilities position, reporting to Mr. Krause, and gave him a substantial raise. (Jackson part I dep. tr. 30-31). It promoted Larry Simone from Building Manager at Proviso West into the vacant position of Assistant Director of Facilities, reporting to Mr. Gianneschi, and gave him a substantial raise. (Id.; Simone dep. tr. ^–transcript on order). It promoted Anthony Sullivan into the now vacant position of Building Manager at Proviso West, reporting to Mr. Simone, and gave him a substantial raise. (Jackson Part I dep. tr. 31).

**RESPONSE**:          Plaintiff objects to Def.'s Fact ¶ 17 on the basis that it is not material,

relevant or relied upon in support of Defendant's motion for summary judgment. *See* Def.'s Mem.

The cited evidence does not supported the proposed fact that Gianneschi, Simone and Sullivan were

given substantial raises. Further, Def.'s Fact ¶ 17 is disputed. Mr. Sullivan's promotion to Building

Manager of Proviso West resulted in a decrease in his salary as a result of the loss of overtime

opportunities. Anthony Sullivan Dep. __ (transcript on order).

18.          That created an additional opening for Building Manager at Proviso East. (Jackson part I dep. tr. 30-31). Messrs. Gianneschi and Simone were then immediately assigned the task of filling the now vacant position at East with the best possible candidate to replace Gianneschi. (Jackson Part I dep. tr. 38-39). They promptly found their man: Board President Mike Manzo's first cousin, Gino Trombetta. (Jackson part I dep. tr. 38-39, 49-50; Trombetta Part I dep. tr. 26-27).

**RESPONSE**:          Plaintiff objects to Def.'s Fact ¶ 18 on the basis that it is not material,

relevant or relied upon in support of Defendant's motion for summary judgment. *See* Def.'s Mem.

In addition, the cited evidence does not support the proposed fact that "Gianneschi and Simone were

then immediately assigned the task of filling the now vacant position at East with the best possible

candidate to replace Gianneschi." Further, Def.'s Fact ¶ 18 is disputed. Trombetta applied for three

positions at School District 209 before being hired as the Building Manager. Trombetta Decl. ¶ 2.

Simone, one of the two individuals responsible for interviewing candidates for Building Manager,

never heard that Trombetta had been recommended by any of the board members. Larry Simone

Dep. 40-41 ("Simone Dep.")(attached as Ex. T).

7

19.     Gianneschi and Simone recommended Trombetta to Superintendent Jackson (Jackson Part I dep. tr. 49-50), who dutifully recommended Trombetta to the Board. (Jackson part I dep. tr. 32, 38-39). The Mike Manzo board voted to hire Trombetta. At the time of his hiring, Trombetta was only 31 years old. Superintendent Jackson was never told until after the hiring was approved that Trombetta was Board President Mike Manzo's first cousin. (Jackson Part I dep. tr. 43).

**RESPONSE:**     Plaintiff objects to Def.'s Fact ¶ 19 on the basis that it is not material,

relevant or relied upon in support of Defendant's motion for summary judgment. *See* Def.'s Mem.

Furthermore, Def.'s Fact ¶ 19 is disputed. Jackson testified that he could not recall if he learned that

Trombetta was Manzo's cousin before or after the time Trombetta was hired. Jackson 5/29/03 Dep.

42-43.

20.     Gianneschi had prepared a lengthy written report analyzing Trombetta's qualifications (Jackson Part I dep. 49) and concluded that Trombetta was the outstanding candidate for this position. When Gianneschi presented his recommendation to Superintendent Jackson, Jackson reviewed the report, reviewed Trombetta's resume, and exclaimed "What the fuck is this?" (Jackson Part I dep. tr. 50-55). Gianneschi told him he didn't agree with the hiring, had serious problems with it, but that he was being subjected to a lot of pressure from "upstairs." (Jackson Part I dep. tr. 50-55). He rolled his eyes upward and asked Jackson not to make him explain what he meant. (Jackson Part I dep. tr. 54). All hiring and firing decisions are made by the Board. (Jackson Part I dep. tr. 32).

**RESPONSE:**     Plaintiff objects to Def.'s Fact ¶ 20 on the grounds that it is hearsay

and that it is not material, relevant or relied upon in support of Defendant's motion for summary

judgment. *See* Def.'s Mem. Further, Def.'s ¶ 20 is disputed. Sullivan and Trombetta were the

candidates who were rated the highest by Simone and Gianneschi following the interview process

for position of Building Manager. Jackson 5/29/03 Dep., Ex. 1. Simone received no pressure from

anyone in recommending Trombetta's hiring and is not aware that Gianneschi did either. Simone

Dep. 40-43. In April 2000, Jackson recommended hiring Trombetta. 3/20/00 Minutes of Regular

Meeting at 10 (attached as Ex. II).

8

21.     Jackson felt based on the contents of the recommendation and Trombetta's resume that Trombetta was only marginally qualified. (Jackson Part I dep. tr. 51-52). Nonetheless, he went along with the program and approved the hiring, but made it clear to Gianneschi that whatever it took to make sure Trombetta got the job done, including having to train him on the job or cover for him, would be Gianneschi's responsibility. (Jackson Part I dep. tr. 50-51).

**RESPONSE:**     Plaintiff objects to Def.'s Fact ¶ 21 on the grounds that it is hearsay and that it is not material, relevant or relied upon in support of Defendant's motion for summary judgment. *See* Def.'s Mem. Because Jackson was not consulted prior to Trombetta's termination, his views on Trombetta's qualifications are irrelevant. Jackson 7/24/03 Dep. 264-265. Further, Def.'s ¶ 21 is disputed. Sullivan and Trombetta were the candidates rated the highest by Sullivan and Gianneschi following the interview process for position of Building Manager. Jackson 5/29/03 Dep., Ex. 1. In April 2000, Jackson recommended hiring Trombetta. 3/20/00 Minutes of Regular Meeting at 10.

22.     According to his resume (Trombetta Part II dep. Exhibit 2, attached hereto as Exhibit 7), Trombetta had previously been a janitor at a local elementary school and for two years was a supervisor overseeing a staff of two. (Trombetta Part I dep. tr. 11, 21; Jackson Part I Exhibit 1). He also worked for several years as a laborer on a plumbing crew and then as a labor foreman, laying sewer pipes. (Trombetta Part I dep. tr. 12-13). According to his resume, he was also skilled in the operation of a backhoe. (Jackson Part I Exhibit 1). However, just before he applied for the building manager's position (Trombetta Part I dep. tr. 37-38) he signed up at Triton College for a course on how to read blueprints and according to his resume was still taking the course at the time of his hiring. (Trombetta dep. Exhibit 2; Jackson Part I Exhibit 1; Jackson Part I dep. tr. 55-56).

**RESPONSE:**  Plaintiff objects to Def.'s Fact ¶ 22 on the grounds that it is not material, relevant or relied upon in support of Defendant's motion for summary judgment. *See* Def.'s Mem. Furthermore, Def.'s Fact ¶ 22 is disputed. From 1987 to 2000, Trombetta worked in maintenance in School District 89, and from 1998 to 2000, he worked as the Building Manager of a District 89 school. Plaintiff disputes Def.'s Fact ¶ 22 to the extent it asserts that Trombetta's sole job responsibility as a labor foreman was "laying sewer pipes," Trombetta 4/22/03 Dep. 14, or purports

to describe all of Trombetta's experience, skills, and qualifications. In addition, Plaintiff testified

that he took classes in construction management at Triton College in 1998 or 1999, while he was still

working at District 89. Trombetta 4/22/03 Dep. 37.

23. All three of the other supervisory personnel–Gianneschi, Simone and Sullivan–were older, had many more years with the District, and were more experienced than Trombetta in terms of their job skills. (Jackson part I dep. tr. 47-48). Gianneschi, whom Trombetta replaced as Building Manager at Proviso East, had been with the District for 22 years and had three years of college at Northern University, and was just shy of a degree. (Jackson Part I dep. tr. 48). He had served in a number of capacities at the District before working his way up to building manager. He had worked in all the key divisions that would prepare one for becoming an office assistant to the building manager. (Jackson Part I dep. tr. 48). He understood the purchasing process, custodial maintenance, and plumbing jobs. Gianneschi knew the job from the ground up. Id.

**RESPONSE:** Plaintiff objects to Def.'s Fact ¶ 23 on the grounds that it is not

material, relevant or relied upon in support of Defendant's motion for summary judgment. *See*

Def.'s Mem. The cited evidence does not provide support for the proposed fact that Simone and

Sullivan were older, more experienced or had been with the district longer. Furthermore, Def.'s Fact

¶ 23 is disputed. Sullivan did not have more experience than Trombetta. Trombetta 4/22/03

Dep. 10-25. (Sullivan Dep. ___)(transcript on order). In fact, Sullivan had had no supervisory

experience when he was promoted to the position of Building Manager of Proviso West. Id.

24. The position of Building Manager at Proviso East is an important job. It entails supervising maintenance of a building half the size of McCormick Place (500,000 square feet), overseeing a staff of approximately 30 employees in the maintenance, custodial, electrical, mechanical, boiler, carpentry and grounds departments; and reviewing budgets, working with outside contractors and performing related administrative duties (Jackson Part I dep. tr. 26-27).

**RESPONSE:** The cited evidence does not support the proposed fact that the

"position of Building Manager at Proviso East is an important job." In addition, Def.'s Fact ¶ 24

is disputed. As Building Manager of Proviso East High School, Plaintiff's job assignments and

duties included: (a) assuring that the facilities and grounds were clean and well- maintained; (b)

10

distributing daily work schedules for maintenance staff; (c) maintaining daily log of maintenance work assigned and completed; (d) evaluating subordinate maintenance employees and submitting such evaluations to Director of Facilities; (e) investigating options for use of contract maintenance services and reporting such information to Director of Facilities; (f) developing and submitting to Director of Facilities lists of necessary maintenance materials and supplies; (g) notifying his supervisor if a condition warranted evaluation or if there were problems with an employee; and (h) performing any other tasks requested or assigned by his supervisors. Plt.'s Resp. to School District Defs.' Interrog. #7; Gregory Jackson 5/29/03 Dep. ("Jackson 5/29/03 Dep.") 26-28; Michael Manzo Dep. 185-86 ("Manzo Dep.")(attached as Ex. O); Emanuel Chris Welch Dep. ("Welch Dep.") 162-63; Trombetta 4/22/03 Dep. 42-52.

As the Building Manager at Proviso East, Trombetta did not have any input into District 209 policies, William Krause Dep. ("Krause Dep.") 57-58, and never developed a budget or allocated money, Trombetta 5/20/03 Dep. 259, 263. Since 2000, William Krause has been the Assistant Superintendent for Technology and Operations, the administrative assistant to the Superintendent responsible for the supervision of all physical facilities and maintenance at School District. Krause Dep. 20-21; Jackson 5/29/03 Dep. 14.

25.     By all accounts, Trombetta did a passable job as building manager at Proviso East, although he required quite a bit of assistance and guidance from Gianneschi and Simone. (Simone dep. tr. ^–transcript on order; Jackson Part I dep. tr. 57-59). Trombetta required quite a bit of help in terms of written documentation such as the procurement process, filling out various forms and assisting him with grammar and preparing documents. (Simone dep. tr. ^–transcript on order; Jackson part I dep. tr. 57-59, 61-65). Trombetta was pretty good at performing the physical duties of the job, maintaining the building itself and working with contractors. (Simone dep. tr. ^–transcript on order).

**RESPONSE:**        Plaintiff objects to Def.'s Fact ¶ 23 on the grounds that it is not

material, relevant or relied upon in support of Defendant's motion for summary judgment. *See*

Def.'s Mem. Furthermore, Def.'s Fact ¶ 25 is disputed. Trombetta did an outstanding job as the

Building Manager of Proviso East High School. Patrick Chico Hernandez Dep. 40 ("Hernandez

Dep.")(attached as Ex. I); Imoni Baxter Dep. 30-31 ("Baxter Dep.")(attached as Ex. C); Manzo Decl.

¶ 28, Ex. C.

26.    In late 2000 and into early 2001, Board President Mike Manzo ran for Mayor of
Melrose Park against incumbent Ronald Serpico. (Manzo dep. tr. 58). At the same time he was
running for mayor, Manzo supported a slate of candidates for the four contested seats on the Board
(the "Manzo slate"). (Manzo dep. tr. 42-43). The Manzo slate consisted of John Wicks ("Wicks"),
defendant Dan Adams, Richard Kluczynski ("Kluczynski") and Imoni Baxter ("Baxter"). Baxter
and Adams were elected to the Board. (Welch dep. tr. 17, attached hereto as Exhibit 8).

**RESPONSE:**        Undisputed except for the spelling of Richard Klaczynski's name.

Rick Klaczynski Dep. 4 ("Klaczynski Dep.")(attached as Ex. M).

27.    A group of four candidates opposed to the Manzo slate put themselves together on
an opposing slate and ran as the Students First Party (the "Students First slate"). The Students First
slate consisted of defendant Welch of Hillside, defendant Carlson of Forest Park, Laquita Neely
("Neely") and Archie Leach ("Leach"). (Welch dep. tr. 16). Welch and Carlson were elected from
the Students First slate.

**RESPONSE:**        Disputed. The Students First Party slate was put together and

supported by Mayor Serpico and Eugene Moore, Cook County Recorder of Deeds. Michael Carlson

Dep. 17-18 ("Carlson Dep.")(attached as Ex. D); Welch Dep. 37-38; Def. Serpico's Resp. Pl.'s

Interrog. #3 (attached as Ex. DDD).

28.    The new board elected in April, 2001 thus consisted of Baxter (technically an
incumbent), defendant Adams (new), Manzo (incumbent), defendant Welch (new), defendant
Carlson (new), defendant Kelly (incumbent) and Robert Smith ("Smith") (incumbent). (Manzo dep.
tr. 43). Due to a change in Illinois school board law, the new school board took office on November
7, 2001 although it had been elected six months earlier in April. (Jackson Part I dep. tr. 67).

12

**RESPONSE:**        Undisputed.

29.        Doug Olson ("Olson") is the long-time Dean of Student Affairs at Triton College, a local community college in the western suburbs. (Olson dep. tr. 7, 10, attached as Exhibit 9). He is a lifelong Melrose Park resident and a supporter of Defendant Mayor Serpico of Melrose Park. (Olson dep. tr. 18). He has a keen interest in improving the quality of the students who come out of District 209 because the two Proviso high schools are major feeder schools into Triton College. (Olson dep. tr. 40). He supported the Students First slate for the School Board because he felt they were also interested in the things he supported for District 209. (Olson dep. tr. 40-41).

**RESPONSE:**        Plaintiff objects to Def.'s Fact ¶ 29 on the basis that it is not material

or relevant. Def.'s Fact ¶ 29 is also disputed. Olson has been dean of student services for six years.

Doug Olson Dep. at 7 ("Olson Dep."). In addition to his full-time job with Triton College, Olson

holds the position of activity supervisor for the Melrose Park Youth Commission, in which he serves

at the pleasure of the Mayor. Olson Dep. 7-9. Despite Olson's expressed "keen interest" in

improving the quality of the Proviso schools, he never has attended a Proviso School Board meeting,

and from 1995-2001, he never contacted the Board for any reason. Manzo Decl. ¶ 29.

30.        Olson also happens to be a lifelong friend of defendant Dan Adams, one of the victorious candidates who ran on the Manzo slate. (Olson dep. tr. 21, 23; Adams dep. tr. 23, attached hereto as Exhibit 10). On election night in April, Olson attended a gathering in Melrose Park to await results of the election. (Olson dep. tr. 27). When it was announced that Dan Adams from the opposing Manzo slate had won, Olson decided to call his friend to congratulate him. (Adams dep. tr. 24-25; Olson dep. tr. 27). Olson also thought at the time that since Adams was an old friend, it might be nice if Adams got together with Mayor Serpico so that he could hear the Mayor's views on educational reform in District 209. (Olson dep. tr. 38-41, 48).

**RESPONSE:**        Disputed. It was Serpico's idea to meet Adams, not Olson's. In

Defendant Serpico's interrogatory answers, Serpico stated, "After the election, I do recall that I

contacted Doug Olson, who is a friend of Dan Adams, to ask if he would arrange a meeting between

myself and Dan Adams." Def. Serpico Resp. Pl. First Set of Interrog. #7. Def.'s Fact #30 is also

disputed insofar as it asserts Serpico wanted to get together with Adams to share his views on

13

educational reform. See Pl. Facts ¶¶ 4, 13-15, 21-27, 29-35, 37, 40-42, and 65. Serpico "does not really care about 209. That's not his stick." Jackson 5/29/03 Dep. 122.

31.     Calling Adams was entirely Olson's idea. The Mayor did not approach Olson, he approached the Mayor. (Olson tr. 40). When he told the Mayor about his idea, the Mayor said he would be happy to meet with Adams and to share his ideas on how to improve the schools. (Olson tr. 51-52). The Mayor shared many of Olson's concerns about the state of education in District 209 and also shared Olson's desire to see improvements that a change in leadership might be able to accomplish. (Olson tr. 41).

**RESPONSE:**     Disputed. It was Serpico's idea to meet Adams, not Olson's. In Defendant Serpico's interrogatory answers, Serpico stated, "After the election, I do recall that I contacted Doug Olson, who is a friend of Dan Adams, to ask if he would arrange a meeting between myself and Dan Adams." Def. Serpico Resp. Pl. First Set of Interrog. #7. Def.'s Fact #30 is also disputed insofar as it asserts Serpico wanted to get together with Adams to share his views on educational reform. See Pl. Facts ¶¶ 4, 13-15, 21-27, 29-35, 37, 40-42, and 65. Serpico "does not really care about 209. That's not his stick." Jackson 5/29/03 Dep. 122.

32.     While at the victory party on election night, Olson then called Adams to tell him he had won. At first, Adams did not believe him, telling him that he could not believe he had won because he never even campaigned for the job. (Olson dep. tr. 31-32). Olson then asked Adams if he would be interested in meeting with the Mayor to discuss some of the Mayor's thoughts on educational reform, and Adams replied that he would like to do that. (Olson dep. tr. 49, 51-52; Adams dep. tr. 25-27). Adams met with Doug Olson and Mayor Serpico within a week or so after the election at the Mayor's law office. (Olson dep. tr. 52-54; Adams dep. tr. 25-27).

**RESPONSE:**     Plaintiff objects to Def.'s Fact ¶ 32 on the grounds that it is hearsay, not material, relevant or relied upon in support of Defendant's motion for summary judgment. *See* Def.'s Mem. Def.'s Fact ¶ 32 is also disputed. When Olson called Adams on election night, he "figured he had known [that he had won]." Olson Dep. 30-31. It was Serpico's idea to meet Adams, not Olson's. In Defendant Serpico's interrogatory answers, Serpico stated, "After the election, I do

14

recall that I contacted Doug Olson, who is a friend of Dan Adams, to ask if he would arrange a

meeting between myself and Dan Adams." Def. Serpico Resp. Pl. First Set of Interrog. #7. Def.'s

Fact #30 is also disputed insofar as it asserts Serpico wanted to get together with Adams to share his

views on educational reform. See Pl. Facts ¶¶ 4, 13-15, 21-27, 29-35, 37, 40-42, and 65. Serpico

"does not really care about 209. That's not his stick." Jackson 5/29/03 Dep. 122.

33.    Adams, who had never met the Mayor before (Adams dep. tr. 23), recalls that he had heard some rumors flying around to the effect that the Mayor was going to try to influence Dan Adams by threatening to fire Adams' father. (Adams dep. tr. 34; Olson dep. tr. 66, 94-95). Adams father worked in the Water Department for the Village of Melrose Park and has worked there since 1994 (Adams dep. tr. 34).

**RESPONSE:**        Undisputed. *See also* Pl. Fact ¶¶ 22, 29-34.

34.    The source of the rumors has never been identified, but several people have heard Mike Manzo repeat the rumor[3] many times[4], including Dale Crawford (Crawford dep. tr. 106-07,

---

[1]    A few days before the swearing in, Adams got a call from Mike Manzo telling him about a victory party Manzo had planned for November 7, 2001 after the school board meeting and Adams told him about his change of heart. Manzo came to his house and thereafter had several lengthy phone calls including one the afternoon of the swearing in. According to Adams, Manzo repeatedly asked Adams if Serpico had threatened his father's job at the Water Department and Adams told him there were no such threats. Manzo persisted in his assertions that the Mayor must have "gotten to him" through his father. Adams denied there was ever any threat and told Manzo that it was simply that he liked the educational priorities of the new board members backed by Serpico and no "pressure" of any kind was involved. (Adams dep. tr. 236-37)

**RESPONSE:**        Plaintiff objects to Footnote 2 as it is not a properly asserted fact pursuant to Local Rule 56.1. This footnote is also disputed. Manzo never called Adams to tell him about a victory party, Manzo Decl. ¶ 11. *See* Pl.'s Resp. Def.'s Fact ¶ 34 in response to remaining assertions.

[2]    Mr. Manzo has actually gone so far as to recite his accusations of undue influence on the Board by taking out an ad in a local newspaper, which has now resulted in his being sued by the current Board members for libel as Case No. 02 L 14620 pending in the Circuit Court of Cook County, Law Division. It is also interesting to note that plaintiffs include both the current board majority of Welch, Kelly, Carlson and Adams, as well as Imoni Baxter, *who was elected on the Manzo slate.*

attached hereto as Exhibit 11), Dan Adams (Adams dep. tr. 235-237) and plaintiff. (Trombetta Part I dep. tr. 114).

**RESPONSE:** Disputed. Dale Crawford heard Manzo's side of a phone conversation with Adams on November 6, 2001, the night before the swearing in. Dale Crawford Dep. 126 ("Crawford Dep.")(attached as Ex. H). Specifically, Crawford understood that Adams had to vote with Kelly's majority because Serpico had threatened Adams' father's job. Crawford Dep. 126-131, 141-42. Adams heard the threat regarding his father's job directly from Serpico, not Manzo. Daniel Adams Dep. 23, 31-34, 239-40 ("Adams Dep.")(attached as Ex. A); Serpico 110-111; Manzo Dep. 103-115, 166.

35. Adams recalls that during his meeting with the Mayor, the Mayor specifically addressed those rumors and basically said that Adams' father had nothing to do with it and nothing was going to happen to his father. (Adams dep. tr. 33). The Mayor recalls a similar conversation, but does not recall if it took place at their initial meeting shortly after the election or sometime later that summer when he had occasion to see Adams and the rumors were already circulating about Adams and his father (Serpico dep. tr. 110-116, attached hereto as Exhibit 12).

**RESPONSE:** Disputed. The cited evidence does not support the asserted fact that "The Mayor recalls a similar conversation." The two testimonies are materially different, including that Serpico does not recall any discussion about such rumors.

36. Olson recalls the conversation as well and the details were consistent with the recollections of Adams and Mayor Serpico. Olson recalls that when the Mayor and Adams first met, they talked about various Melrose Park people the two of them might know in common (Olson dep.

---

**RESPONSE:** Plaintiff objects to Footnote 2 as it is not properly asserted fact pursuant to Local Rule 56.1. The case *Welch v. Concerned Citizens of Melrose Park*, Case No. 02 L 14620, settled without any admission or finding of liability. Although Manzo was named as defendant in the case, he did not have to pay the plaintiffs any money as part of the settlement. In addition, after Ms. Baxter learned about the allegations in the suit, she withdrew as a plaintiff. Imoni Baxter Decl. ¶ 12 ("Baxter Decl.")(attached as Ex. Y).

tr. 56) since both Serpico and Adams were lifelong Melrose Park residents. Adams happened to mention to Serpico that his father worked for the Village. (Olson dep. p. 64-65).

**RESPONSE:** Disputed. Adams did not just "happen to mention" that his father worked for the Village of Melrose Park. The issue of Serpico's alleged threats to Adams' father were discussed. Ronald Serpico Dep. 110-111 ("Serpico Dep.")(attached as Ex. S); Adams Dep. 33.

37. During the meeting the Mayor shared some of his thoughts about how he felt the schools in District 209 could be improved and asked Adams if he would be willing to just listen to the candidates the Mayor had supported to find out where they stood on the issues. (Adams dep. tr. 33; Olson dep. tr. 56). Adams agreed with the Mayor's suggestion that he meet with Welch, Carlson and Kelly to hear their views. (Adams dep. tr. 106).

**RESPONSE:** Disputed. Serpico forced Adams to switch allegiances on the School Board by threatening to fire Adams' disabled father from the Village of Melrose Park if he did not. Manzo Dep. 103-115, 166; Crawford Dep. 73-75, 129, 141-142.

38. Olson recalled that almost immediately after the election, rumors began circling about Adams' father and that Mayor Serpico might try to influence Adams through threats to his father. Adams had heard such rumors and was concerned, and mentioned it at the meeting to Serpico. The Mayor said he, too, had heard about the rumors but that there was no substance to them, that Adams father was in no kind of jeopardy and that Adams should vote the way he believed. (Olson dep. tr. 57, 65-66, 94-95; Adams dep. tr. 155-157; Serpico dep. tr. 110-116).

**RESPONSE:** Disputed. Serpico forced Adams to switch allegiances on the School Board by threatening to fire his disabled father from the Village of Melrose Park if he did not. Manzo Dep. 103-115, 166; Crawford Dep. 73-75, 129, 141-142.

39. In addition to the first meeting at Mayor Serpico's office, Adams met the Mayor a couple other times before he was sworn in on November 7, 2001: once at Gibson's Steakhouse where he met the other three members of the school board who would constitute a voting bloc--Welch, Carlson and Kelly--and once where they bumped into each other at the Our Lady of Mt. Carmel Festival in July, 2001. They just said hello at the festival and that was it. (Adams dep. tr. 97-98). He may also have said hello to the Mayor at the Taste of Melrose Park on Labor Day, 2001. (Adams dep. tr. 100).

**RESPONSE:** Disputed. Adams also had a meeting with Serpico and Burt Odelson during which Serpico and Odelson told Adams that he had to vote with Kelly's slate. Manzo Dep. 105-107.

40. At Gibson's Steakhouse Adams saw the Mayor when he met with the other three school board members. New school board member Welch and Mayor Serpico put together the meeting and the purpose was to lay out the new members' education agenda and ask Adams if he could support it. (Welch dep. tr. 34,50). Welch had heard that Adams was a good person and really cared about the schools and liked the idea of meeting him and getting to talk to him. (Welch dep. p. 36).

**RESPONSE:** Disputed. Serpico forced Adams to switch allegiances on the School Board by threatening to fire his disabled father from the Village of Melrose Park if he did not. Manzo Dep. 103-115, 166; Crawford Dep. 73-75, 129, 141-142. Welch did not recruit Adams because he had heard he was a good person who really cared abut the schools; he recruited Adams because Adams was the possible swing vote. Serpico Dep. 101.

41. During the meeting the three of them explained to Adams that they wanted to get test scores up, attendance up, and improve security. (Adams dep. tr. 78). At the dinner at Gibson's, Serpico just sat there and ate, and did not substantively participate in any of the discussions. (Adams dep. tr. 79, 241-242). Adams liked the three board members and liked their platform. He decided he liked their platform better than Manzo's and decided to vote with them and their educational priorities. (Adams dep. tr. 143-145).

**RESPONSE:** Disputed. Kelly does not recall any such discussion at the dinner meeting. Theresa Kelly 7/23/03 Dep. 45-46 ("Kelly Dep.")(attached as Ex. L). *See also* Pl.'s Resp. to Def.'s Facts ¶ 37.

42. On the evening of November 7, 2001 the new school board members were sworn in and a new majority, consisting of Kelly, Welch, Carlson and their new ally Dan Adams took control of the Board. (Welch dep. tr. 72 and Exhibit 3 of Welch dep.). The new school board made several important decisions. First, they voted Mike Manzo off as President and elected Theresa Kelly President and Chris Welch Vice President. (Welch dep. Exhibit 3).

18

**RESPONSE:**        Disputed. Rob Smith was the other candidate for President, not Manzo. 11/7/01 Minutes of Regular Meeting-Reorganization of New Board of Education at 2 (attached as Ex. NN). The new board elected Kelly to be president in place of Manzo, approved the hiring of the law firm of Odelson & Sterk to do all the legal work for the district in place of Kusper & Raucci, and voted to rescind the purchase of the magnet school property in Leyden Township. 11/7/01 Minutes of Regular Meeting-Reorganization of New Board of Education at 2-6.

43.    Next, they voted to fire the law firm of Kusper and Raucci and to hire the law firm of Odelson and Sterk. The Kusper firm had been hired around 1997 when Manzo first was elected to the school board, displacing the firm Ancel, Glink et al. who had been the School Board's attorneys for more than 45 years. (Jackson Part II dep. tr. 320-22). Welch had determined while doing his research into school board matters over the summer before he took office that the Kusper law firm had charged District 209 upwards of $500,000 and that it was simply too expensive. The law firm of Odelson and Sterk is now charging District 209 a lot less. (Welch dep. tr. 39, 98).

**RESPONSE:**        Plaintiff objects to Def's. Fact ¶ 43 on the basis that it is not material, relevant or relied upon in support of Defendant's motion for summary judgment. *See* Def.'s Mem. Furthermore, Def.'s Fact ¶ 43 is disputed. Manzo was first elected to the School Board in 1995, not 1997. Manzo Decl. ¶ 1. Kusper & Raucci's bills for the 2000-2001 school year were uniquely high as a result of several issues, including a teachers' strike, lengthy negotiation with the teachers before the strike, and lengthy negotiations with support staff and the custodians. Manzo Decl. ¶ 30.

44.    Finally, the new school board authorized an accounting firm to conduct an immediate audit of the District's finances. (Welch dep. tr. 72 and corresponding dep. Exhibit 3).

**RESPONSE:**        Disputed. The School Board hired S.P. King to review the operational, financial and governing functions, not to conduct an audit. 2/18/02 Minutes of Regular Meeting at 12 (attached as Ex. PP).

45.    In February, 2002, the accountants hired by the new Board majority presented their audit report (the "King Report") on District 209's finances and highlighted some problem areas.

19

(Welch dep. tr. 90). Among them were possible unnecessary duplication of staff and possible irregularities with one particular contractor to the District, J&J Contractors, whom the Maintenance Department seemed to use an awful lot. (Welch dep. tr. 93).

**RESPONSE:** Disputed. The School Board hired S.P. King to review the operational, financial and governing functions, not to conduct an audit. 2/18/02 Minutes of Regular Meeting at 12. The SP King report was inaccurate. Krause Dep. 92. The SP King report had nothing to do with Trombetta's firing. Adams Dep. 221-22; Jackson Dep. 7/24/03 259. The SP King report does not mention duplication of staff. Manzo Decl. ¶ 27, Ex. B.

46. The new school board began taking immediate action based on the comments and suggestions raised in February by the King Report. (Welch dep. tr. 93). Part of what the new school board was also looking at included issues of what functions people had and what possible duplication existed. (Welch dep. tr. 93).

**RESPONSE:** Disputed. *See* Response to Def.'s Fact, ¶ 45.

47. At the March, 2001 school board meeting, one month after receiving the King accounting report, they conducted a closed session where they called each of the four maintenance supervisors (Gianneschi, Simone, Sullivan and Trombetta) into the meeting, one by one, and asked them what jobs they performed. They did not pass judgement on their performance; the inquiry solely dealt with identifying areas where they felt they could save money. (Welch dep. tr. 97-98). No one was singled out and everyone was basically asked the same questions and treated the same. (Welch dep. tr. 183-84).

**RESPONSE:** Disputed. The purpose of the closed session meeting was to inquire about School District 209's hiring of J&J Contractors, not to study of the merits of any personnel reorganization or to identify areas where money could be saved. 3/18/02 Minutes of Closed Session Meeting at 3-4 (misdated 3/18/01)(attached as Ex. QQ); Baxter Dep. 12-14; Krause Dep. 43-47; Manzo Dep. 73; Carlson Dep. 146; Kelly 7/23/03 Dep. 118-19; Manzo Decl. ¶16; Baxter Decl. ¶2; Trombetta Decl. ¶ 4. Trombetta was singled out and interrogated by Welch in a hostile manner. Manzo Dep. 74.

48.     From talking to the four maintenance supervisors, it appeared there was duplication of jobs. (Welch dep. tr. 97).  Based on the March, 2002 inquiry, it was obvious that Trombetta was not needed when there were people with more experience and seniority. (Welch dep. tr. 97-98).

**RESPONSE:**     Disputed. See Pl. Resp. Def.'s Fact ¶ 47.

49.     Duplication and "fat" from the system needed to be eliminated. Id.  In fact, although Trombetta was nominally running Proviso East, and although Gianneschi was technically the Director of Buildings and Grounds in charge of both schools, to Welch it was pretty clear that Gianneschi was basically running Proviso East. (Welch dep. tr. 190).

**RESPONSE:**     Disputed. See Responses to Def.'s Facts ¶¶ 45 and 47.

50.     In addition to the restructuring of the maintenance department resulting in the elimination of duplication between the job of Director of Facilities and Assistant Superintendent (Welch dep. tr. 190) (which was where the real duplication was [Id.]), the School Board initiated numerous other restructurings that have resulted in savings to District 209.

**RESPONSE:**     Disputed.  Defendant fails to provide any citation to record evidence to support the last sentence of Def.'s Fact ¶ 40. In addition, there was no duplication between the jobs of Director of Facilities and Assistant Superintendent. Krause Dep. 35-37, 39, and 58-60. Simone Dep. 14-16. Jackson 5/29/03 Dep. 138. The number of teaching positions within School District 209 has increased from 2001 to 2002.  Baxter Decl. ¶ 9.  School District 209 is in the process of reorganizing its data processing department because of the need to update its computer system from mainframe to personal computers.  Krause Dep. 26-29.  The district has not terminated the employment of any members of the data processing department. Krause Dep. 29. School District 209 reorganized the security department.  After the board eliminated the positions of twelve part-time truancy officers, it rehired six of those employees as full-time truancy officers and the other six as full-time security personnel. Jackson 7/24/03 Dep. 316-17.

51.     They got rid of a lot of unnecessary teaching positions that saved the School District over a million dollars. (Welch dep. tr. 152).  They got rid of an unnecessary consultant, Dale Crawford, who was charging a lot of money for doing the same kinds of tasks that normally would

21

be done by the school superintendent. (Welch dep. tr. 98). Crawford conceded as much (Crawford dep. tr. 87-88) and explained that he was only doing these tasks because there had been a temporary superintendent before Greg Jackson was hired. (Crawford dep. tr. 87). His job as an outside consultant was rendered unnecessary when they hired Superintendent Greg Jackson on a permanent basis to handle the types of jobs Crawford was doing (Welch dep. tr. 95) such as negotiating labor contracts. (Crawford dep. tr. 95-96).

      **RESPONSE:**      Disputed. The number of teaching positions within School District 209 has increased from 2001 to 2002. Baxter Decl. ¶ 9. Welch, Kelly, Carlson and Adams terminated the relationship with Dale Crawford because he was on the "hit list" of individuals who were targeted after November 2001 in retaliation for their political support for Manzo and Manzo's slate of candidates in the April 2001 election. Crawford Dep. 80, 114-116; Manzo Decl. ¶ 8; Baxter Dep. 18-20, 37-38.

      52.     Recently, the Board has restructured the entire data processing department and has let the entire department go. (Welch dep. tr. 180).

      **RESPONSE:**      Disputed. School District 209 is in the process of reorganizing its data processing department because of the need to update its computer system from mainframe to personal computers. Krause Dep. 26-29. The district has not terminated the employment of the any members of the data processing department. Krause Dep. 29.

      53.     It is not true that only supporters of Mike Manzo were targeted for termination. (See, Welch dep. tr. 180-82). Approximately 25 to 30 members of the Maintenance Department were announced supporters of Mike Manzo's campaign for Mayor and none of them lost their jobs as a result of political retaliation. (Simone dep. tr. 30).

      **RESPONSE:**      Disputed. Unlike the maintenance administrators, who were all demoted with the exception of Sullivan, the maintenance employees are all protected by a union contract. Manzo Decl. ¶ 31. See Pl.'s Resp. Def.'s Fact ¶ 54. See also Pl. Facts ¶¶ 71-77.

      54.     Gianneschi was also a supporter of Mike Manzo; yet, he didn't lose his job. (Jackson Part I dep. tr. 109; Manzo dep. tr. 63). Simone was a supporter of Mike Manzo; he didn't lose his job

either, and although his job title was changed, he kept the same duties and maintained the same rate of pay as before the restructuring. (Simone dep. p. 18-19, 30-31, 34; Manzo dep. tr. 63). Rocco Manzo, Mike Manzo's father, another supporter of his son Michael's mayoral campaign, was employed by District 209 in the maintenance department and didn't lose his job. (Manzo dep. tr. 31, 193-94). Vince Trombetta, another cousin of Mike Manzo, is also employed in the maintenance department of District 209 and he didn't lose his job either. (Welch dep. tr. 193-95, 218).

**RESPONSE:**      Disputed. Gianneschi was demoted from Director of Facilities to

Building Manager of Proviso East. 4/18/02 Minutes of Reconvened Meeting at 9-11 (attached as Ex.

VV). Simone was demoted from Assistant Director of Facilities to Assistant Building Manager. *Id.*

After the shift in the Board majority in November 2001, Rocco Manzo's colleagues began to harass

him and he was denied overtime opportunities. Rocco Manzo Decl. ¶¶ 3, 5 ("Rocco Manzo

Decl.")(attached as Ex. BB); Rocco Manzo Dep. 17, 25 ("Rocco Manzo Dep.")(attached as Ex. P).

When Rocco Manzo complained to Gianneschi (his supervisor), Gianneschi stated that he had to do

what Kelly and Serpico had instructed him to do. *Id;* Rocco Manzo Dep. 18-19. After filing a union

grievance and trying to resolve the problem, Rocco resigned under protest. *Id.* ¶¶ 4, 6-7; Rocco

Manzo Dep. 28-29. Vince Trombetta was passed over for a promotion and harassed by his supervisor

because of his relationship with Manzo and Trombetta. Manzo Decl. ¶ 23.

55.     At the time of he voted to terminate Trombetta, Adams did not know that Trombetta worked in Mike Manzo's campaign for Mayor in April, 2001. (Adams dep. p. 59). Nor did he know whether Simone or Gianneschi, the two "supporters" of Mike Manzo's campaign for Mayor, supported Manzo in that campaign. (Adams dep. tr. 61). He just voted to save some money and eliminate a position they didn't need. (Adams dep. tr. 183). It wasn't something he wanted to do, but they needed to save money. (Adams dep. tr. 197).

**RESPONSE:**      Disputed. Prior to Trombetta's termination in April 2002, Adams

knew that Trombetta was Manzo's cousin and that he was working on the campaign on behalf of

Manzo and Manzo's slate of candidates. Adams Dep 59-60; 2/18/02 Minutes of Regular Meeting at

1, 10; 3/18/02 Minutes of the Regular Meeting at 1, 18; Trombetta Decl. ¶ 3.

56.     Board member Mike Carlson also did not know Trombetta was involved in Mike Manzo's campaign for Mayor. (Carlson dep. tr. 56, attached hereto as Exhibit 13). He had no idea Trombetta was even Mike Manzo's cousin until this lawsuit was filed. (Carlson dep. tr. 55). He has never been a resident of Melrose Park.

**RESPONSE:**     Disputed. Prior to Trombetta's termination in April 2002, Carlson knew that Trombetta was Manzo's cousin and that he had supported Manzo and Manzo's slate of candidates in the April 2001 election.   Manzo Decl. ¶ 7; Robert Smith Decl. ¶ 2 ("Smith Decl.")(attached as Ex. DD); 2/18/02 Minutes of Regular Meeting at 1, 10; 3/18/02 Minutes of the Regular Meeting at 1, 18.

57.     Carlson never spoke to anyone (including Mayor Serpico) about the personnel move to terminate Trombetta other than when he called Welch a week or so before the school board meeting when they received their school board packets. (Carlson dep. tr. 45). He asked Welch what the agenda item was all about and why they were eliminating the position of Director of Buildings and Grounds. Welch basically told him they wanted to "trim some fat" out of the overhead of the administration. (Carlson dep. tr. 45). That seemed to Carlson to be a reasonable explanation. (Carlson dep. tr. 45).

**RESPONSE:**     Disputed. Carlson discussed terminating Trombetta with Welch, Kelly and Adams, even before he was sworn in as a Board member. See Pl. Fact ¶ 27.

58.     Carlson met Serpico at a fundraiser at the Holiday Inn in Hillside. (Carlson dep. tr. 97). The Mayor wished him luck and Carlson thanked him for his support. (Carlson dep. tr. 100). There was never any long conversations between the Mayor and Carlson other than pleasantries. (Carlson dep. tr. 102).

**RESPONSE:**     Disputed.  Carlson met with Serpico at the dinner at Gibsons that Serpico had arranged. Welch Dep. 34. See Def.'s Fact ¶ 41.

59.     Board member Welch never asked Mayor Serpico, nor was he ever told by Mayor Serpico, how to vote on any issue, including Trombetta's termination of employment. (Welch dep. tr. 180). He never discussed anything related to Trombetta with the Mayor. (Welch dep. tr. 191). If someone tried to tell Welch how to vote he would not listen to them anyway. (Welch dep. p. 180). He voted to reorganize the maintenance staff to eliminate duplication and believed it was a good thing for the school district. He assumes the other board members voted the same way for that reason. (Welch dep. tr. 180).

24

**RESPONSE:**          Disputed. See Plaintiff's Proposed Statement of Material Facts ("Pl.

Facts") ¶¶ 52-69 and 78.

60.     The decision to let Trombetta go was made by the school board and Mayor Serpico had absolutely no input into that decision. (Welch dep. tr. 177).

**RESPONSE:**          Disputed. See Pl. Fact ¶¶ 64-65 and 78.

61.     Board member Kelly also had no idea who Trombetta supported for Mayor of Melrose Park in the 2001 mayoral election. (Kelly dep. tr. 84, attached hereto as Exhibit 14). She never discussed any matters of District 209 business with Mayor Serpico including the matter of Trombetta's termination. (Kelly dep. tr. 133). She denies she ever said anything to Mike Manzo to the effect that she "had to" vote to terminate Trombetta because "Mayor Serpico told her to do it." (Kelly dep. tr. 132). Board member Mike Manzo, who by this time had been deposed as President, claims he was alone when Kelly made the alleged statement. (Manzo dep. tr. 133-34). Superintendent Jackson, who was the only other person present for portions of the meeting, certainly never heard anything like that. (Jackson Part I dep. tr. 119).

**RESPONSE:**          Disputed. See Pl. Fact ¶¶ 10, 64-65 and 78.

62.     The notion of looking at all of the departments within the district and trying to determine if they needed everyone, and possibly eliminating positions in various departments was a discussion Mrs. Kelly began to have with Welch after the election and before the swearing in. (Kelly dep. tr. 15-25). It was not just the maintenance department; they were looking at all the departments to see where cuts could be made. (Kelly dep. tr. 23, 25). It seemed like some of the employees were doing "double jobs." (Kelly dep. tr. 26-27).

**RESPONSE:**          Disputed. See Pl. Fact ¶¶ 16-18, 27, and 52-68.

63.     For example, in the maintenance department the jobs being performed by Gianneschi and Simone were overlapping with those performed by the building managers such as Trombetta. (Kelly dep. tr. 27). The elimination of positions for the purpose of eliminating duplication of jobs was something Kelly and Welch had been talking about for several months. (Welch dep. tr. 128). Welch certainly urged the decision and Kelly agreed with it. Id.

**RESPONSE:**          Disputed. See Pl. Fact ¶¶ 65-68.

64.     After Trombetta was terminated, the hierarchy in the Maintenance Department collapsed back down to where it had been before the original Mike Manzo restructuring in early 2000 when Trombetta was hired. Assistant Superintendent Krause re-acquired many of the supervisory duties being handled by Gianneschi. (Krause dep. p. 36-37, attached as Exhibit 15). Gianneschi went back to his old job as Building Manager at Proviso East, although the Board decided to keep him at

the same salary to which he had been elevated as a result of the Manzo restructuring. Simone went from being the Assistant Director of Facilities–a position technically higher than that of Building Manager--to the position of Assistant Building Manager at both East and West, a position technically below that of Building Manager, but kept the exact same duties and the same elevated rate of pay which he had been given by the Manzo restructuring. (Simone dep. tr. 19, 31, 34).

**RESPONSE**: Disputed. The hierarchy in the maintenance department did not return to its pre-2000 state. The position of Assistant to the Building Managers was a newly created position, one that had not previously existed. Manzo Decl. ¶ 4. In addition, the cited evidence does not support the allegation regarding Krause, who never previously had these duties. *See also* Pl.'s Resp. to Def.'s Fact ¶ 16.

65. Trombetta's employment was terminated. He was the most junior of the four maintenance supervisory personnel in the group and had the least amount of seniority and experience at District 209. (Carlson dep. tr. 36-39). Gianneschi, Simone and Sullivan all remained with the District.

**RESPONSE**: Disputed. Trombetta did not have less experience than Sullivan. Trombetta 2/22/03 Dep. 10-25.

66. The District saved money by collapsing the administrative structure of the Maintenance Department back to where it was before Trombetta was hired because it saved the cost of Trombetta's salary. (Welch dep. tr. 97). The District was able to spread the duties of the Director of Facilities around so that all of the responsibilities were handled by the remaining staff. The duplication was not Trombetta's job, it was actually the Director of Facilities, the vacant job into which Gianneschi had been promoted two years earlier to make room for Trombetta. That job really was being satisfactorily performed by Krause and, therefore, was an unnecessary position. (Welch dep. tr. 97).

**RESPONSE**: Disputed. The District did not save money in the maintenance area. Barten Decl. ¶ 8. The maintenance department did not go back to where it had been before Trombetta was hired. *See* Response to Def.'s Fact ¶¶ 15, 16, and 64. Krause was not doing the job duties of the Director of Facilities. Id.

26

67.     Mayor Serpico had no involvement with the School Board's decision to terminate Trombetta. (Serpico affidavit, ¶ 8, attached hereto as Exhibit 16). He never discussed Trombetta's employment with any school board member before the decision was made to terminate his employment and had no knowledge that it was coming. (Serpico Affidavit ¶¶ 5-6). He did not know before the school board's action was taken that it intended to fire Trombetta and only learned about it after the fact through the "political grapevine." (Serpico Affidavit ¶ 7).

**RESPONSE:**          Disputed. *See* Pl. Fact ¶ 64.

Dated: October 2, 2003                              Respectfully submitted,

                                                    _____
                                                    One of the Attorneys for Plaintiff Generoso Trombetta

Matthew J. Piers
Juliet V. Berger-White
GESSLER HUGHES SOCOL PIERS RESNICK & DYM, LTD.
Three First National Plaza
70 West Madison Street, Suite 4000
Chicago, Illinois 60602
(312) 580-0100