IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
OCT - 8 2003
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| GENEROSO TROMBETTA | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BOARD OF EDUCATION, PROVISO TOWNSHIP | ) |
| HIGH SCHOOL DIST. 209, COOK COUNTY, | ) |
| ILLINOIS; THERESA L. KELLY; EMANUEL | ) |
| "CHRIS" WELCH; DANIEL J. ADAMS; | ) |
| MICHAEL J. CARLSON; RONALD SERPICO; and | ) |
| GREGORY T. JACKSON | ) |
| | ) |
| Defendant. | ) |

No. 02 C 5895

Judge Kennelly

Magistrate Judge Ashman

DOCKETED
OCT 1 4 2003

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS FOR JUDGMENT ON THE PLEADINGS AND MOTIONS FOR SUMMARY JUDGMENT

### I. INTRODUCTION

Plaintiff Generoso Trombetta ("Trombetta"), by his attorneys, submits this memorandum in opposition to the School Board defendants' motion for judgment on the pleadings and motion for summary judgment, and defendant Serpico's motion for summary judgment. In order to avoid duplication, Trombetta addresses all of the defendants' arguments in this single memorandum. As an initial matter, Trombetta acknowledges that this Court's prior ruling that his multi-year employment contract is unenforceable as a matter of law, *Trombetta v. Board of Education*, 2003 U.S. Dist. LEXIS 3993 (N.D. Ill. Mar. 13, 2003), compels the conclusion that he had no property

interest in his job, and that Count III of the First Amended Complaint should accordingly be dismissed.[1]

The remainder of defendants' motions are utterly meritless. Indeed, they are textbook examples of improper motions. Defendants cite little caselaw in support of their arguments and the caselaw they do cite is largely off point. Defendants' treatment of the facts is even worse. Defendants cite a total of **three hundred** purported undisputed material facts in support of their motions for summary judgment.[2] Most of defendants' purported "undisputed material facts" are not that at all, as they are without support in the record. Many, and perhaps most, of them are also not material, concerning such matters as where the individual defendants went to college. Most of the rest are quite clearly in dispute. Defendants repeatedly rely on their own conclusory statements that they did not terminate Trombetta for political reasons. But in fact the record **overwhelmingly** shows that defendants acted for purely political reasons – not only **could** a reasonable jury so find, but it would be most surprising if it did not. Finally, defendants' motions never refer to **any** of their 300 purported facts. For all of these reasons, defendants' motions are utterly devoid of merit and a waste of the Court's time. The motions should be denied, and Trombetta's case should proceed to trial against all defendants.

---

[1] However, it appears that defendants' termination of Trombetta was not lawfully done in light of *Rice v. Board of Trustees*, 326 Ill. App. 3d 1120, 762 N.E.2d 1205 (2002). Based on that case, Trombetta intends to seek reconsideration of the Court's ruling, and may seek at that time to reinstate Count III as well.

[2] As the Court has indicated, this in itself strongly suggests that summary judgment is unwarranted.

2

## II. STATEMENT OF FACTS

**THERE IS AMPLE EVIDENCE UPON WHICH A JURY COULD CONCLUDE THAT DEFENDANTS FIRED TROMBETTA FOR FIRST-AMENDMENT-PROTECTED POLITICAL ASSOCIATION AND SPEECH.**

Perhaps because their purported "undisputed, material facts" are largely not undisputed, material or factually supported by the record, the defendants have, as noted above, studiously avoided any reference in their memoranda to the mountain of "facts" contained in their statements of facts. They do, however, make a number of unsupported, immaterial and disputed fact-related assertions in the memoranda, which are, in sum, as follows: defendants Welch, Carlson and Serpico had no knowledge of Trombetta's political associations (Sch. Bd. Mem at 5; Serpico Mem. at 4-7); there is no evidence of a conspiracy, or at least no evidence that all of the defendants were involved in one (Sch. Bd. Mem. at 12-13; Serpico Mem. at 3-4, 14); there is no evidence that they were motivated by a desire to retaliate for political or speech activities (Sch. Bd. Mem. at 9-11; Serpico Mem. at 11-12); the undisputed evidence shows that Trombetta was fired for the legitimate, non-political reason of low seniority in the context of a personnel reorganization (Serpico Mem. at 11-14); Jackson and Serpico had no legal authority to fire Trombetta, and therefore cannot be legally responsible (Sch. Bd. Mem. at 5; Serpico Mem. at 1-2); the fact that the Board member defendants were in power for five months before they fired Trombetta establishes that they were not motivated by Trombetta's political associations or speech activities (Serpico Mem. at 8-9); Trombetta's statement to the Board at a public meeting one month before he was fired was about purely personal matters and therefore was not protected speech (Sch. Bd. Mem at 7-9); and the position of Building Manager at Proviso East High School was a policymaking position and therefore not protected from politically motivated termination.

3

Each and every one of these factual assertions is contradicted by ample evidence in the record

from which a jury could easily find to the contrary. That evidence includes, but is not limited to, the

following.

Long before Trombetta was fired, in April 2002, each of the defendants was well aware that

Trombetta was Manzo's cousin, as well as an active supporter of both Manzo's campaign to unseat

Serpico as mayor of Melrose Park and of the slate of candidates backed by Manzo for election to the

District 209 Board in the April 2001 elections. Plaintiff's Proposed Statement of Material Facts

("Pl.'s Fact") ¶¶ 7-12. Serpico also knew that Trombetta was Manzo's campaign manager in the

mayoral race. Pl.'s Fact ¶ 7.

Also, one month before he was fired, Trombetta addressed the Board at a public meeting, and

criticized them for directing an investigation into where Manzo's 5-year-old daughter was attending

kindergarten. Pl.'s Facts ¶¶ 49-50. Jackson warned him thereafter that he was in danger of losing

his job as a result of retaliation by the Board. Pl.'s Fact ¶ 51. Although Trombetta's statement

certainly confirmed for those present that he was a supporter of Manzo, his comments were not, as

the Board Defendants claim (Sch. Bd. Mem at 7-9), "a matter of purely personal concern."

Trombetta spoke out, in public, as "a taxpayer" and not as an employee of the Board or Manzo's

cousin, and on a matter of clear public concern. He questioned the need to spend public funds on

such a matter which was unrelated to District 209 business. He said that the action would put the

Board in a bad light, and that it should instead focus on the high school students and teachers of the

District. Pl.'s Fact ¶ 50.

There is also substantial evidence from which the jury could conclude that the defendants

conspired to fire Trombetta as a retaliatory act, including the following. The April 2001 election

4

campaign was hotly contested, and there was bad blood between Serpico and Manzo. Pl.'s Fact ¶ 6. Serpico, Serpico's campaign manger (Robert Ogorzelec), and Welch all vowed retribution against Manzo and Trombetta for their political opposition. Pl.'s Facts ¶¶ 13-15, 42. Serpico attended the District 209 Board meeting on November 7, 2001, when his faction took control. This was the only Board meeting that he has ever attended, and he did so in order to see Manzo "dethroned." Pl.'s Fact ¶ 37. On that occasion, he threatened bodily injury to Trombetta (either that he was going to "rip his eyes out," according to Trombetta; or "break his arm off and shove it up his ass", according to Serpico). Pl.'s Fact ¶ 41. Immediately following the election, Serpico and Welch decided to reach out for Dan Adams, one of Manzo's successful Board candidates, and attempt to get him to change political allegiances. Pl.'s Facts ¶¶ 21, 25. Serpico arranged to meet Adams for the first time within days of the election. Pl.'s Facts ¶¶ 4, 21. Serpico talked to Adams at that meeting about "rumors" that he was going to fire Adams' severely disabled father, a Melrose Park employee. Pl.'s Fact ¶ 22. Within days after their initial meeting, Serpico appointed Adams to the Melrose Park Planning Board, although Adams had no planning background. Pl.'s Fact ¶ 23. Serpico then hosted a dinner meeting for Adams to meet with Welch, Kelly and Carlson. Pl.'s Fact ¶ 25. Welch and Serpico were in regular contact with each other between the April election and the November 2001 swearing in of the new Board. Pl.'s Fact ¶ 26. Following the dinner meeting, Adams attended further meetings with Welch, Kelly and Carlson at Welch's home, at which they discussed the firing of Trombetta. Pl.'s Fact ¶ 27. On the day before the new Board was sworn in, Adams told Manzo that he was going to join the faction of Welch, Kelly and Carlson on the new Board because he had been coerced by Serpico's threat to fire Adams' father if Adams did not do so. Pl.'s Facts ¶ 29-35. Thereafter, Adams voted uniformly with his newfound allies, including on the April 2002 vote to

fire Trombetta. Pl.'s Facts ¶ 40, 65. In June 2002, Serpico appointed Adams' mother to a paid position on the Melrose Park Senior Housing Authority. Pl.'s Fact ¶ 24.

In October 2001, Adams told Manzo and others that he was aware of a "hit list" of District 209 employees who were going to be retaliated against for their political support of Manzo, including Trombetta, Dale Crawford, Fred Gianneschi, Larry Simone, Anthony Sullivan, Stanley Kusper, Joe Lukaszek, and Greg Jackson. Pl.'s Facts ¶ 16-20. After the new Board took over, all but two of these persons were either fired, forced out or demoted within the next few months. Pl.'s Facts ¶¶ 72-78. Sullivan was not fired, because of the intervention of a local politician, Rep. Skip Saviano, who called Serpico to help Sullivan, at the request of one of Sullivan's brothers. Pl.'s Fact ¶ 74. Jackson had a binding multi-year employment contract, and he joined the political conspiracy against Manzo and Trombetta. Pl.'s Fact ¶ 77-78.

After the new Board was sworn in, Welch and Serpico discussed the demotion, termination or replacement of District 209 employees. Pl.'s Fact 26. In addition, there is clear and direct evidence of Serpico's involvement in these acts of retribution on various personnel, including Trombetta. Two days before the vote to fire Trombetta, and four days after Jackson had already relieved Trombetta of his duties, Kelly told Manzo that Trombetta was being fired at Serpico's direction. Pl.'s Facts ¶¶ 53, 64-65. Serpico also took credit for the Board's termination of Kusper and his law firm, and the hiring of the firm of Odelson and Sterk in their stead. Pl.'s Fact ¶ 47. Also, although not among the names mentioned by Adams as being on the "hit list," Anthony G. Scariano was fired as the Board's legal counsel for special education matters shortly after the new Board took over, and Jackson apologized to Scariano, telling him that Serpico had taken control of the Board and wanted him fired and replaced with Odelson & Sterk. Pl.'s Fact ¶ 36.

6

That the new Board did not fire Trombetta until five months after its members took power seems on its face to be a fact of little relevance. Serpico argues, however, that it somehow shows a lack of political motivation. Serpico Mem. at 8-9. Not only is this a stretch, but there is a much simpler explanation suggested by the record. The defendants were quite busy during those months, carrying out other acts of political retribution and reward, including firing and hiring legal counsel, firing Crawford, stopping the magnet school, and directing an investigation into where a 5-year-old child went to kindergarten. Pl.'s Facts ¶¶ 36, 39, 49,72, 76. Also, while they may have waited five months after they took power to fire Trombetta, they did so only one month after he spoke out against their waste of public money and Board credibility in the investigation of Manzo's daughter. Pl.'s Facts ¶¶ 50, 65.

Defendants' strained efforts to portray Trombetta's termination as an apolitical and nonretaliatory by-product of a budget-cutting personnel reorganization are likewise thoroughly contradicted by the record. First, it was admittedly plotted on the heels of the election, and well before the new Board members were even sworn in. Pl.'s Facts ¶¶ 16-18, 27. It took place in the context of adverse treatment of numerous other Manzo political supporters. Pl.'s Facts ¶¶ 20, 71-72, 74-76. It was plotted in secret by the defendants, behind the backs of the three other Board members, was kept off the agenda until the last minute, with no prior Board discussion, by way of an illegal and dishonestly manipulated rescheduling of a Board meeting, without the recommendation of the superintendent (although with Jackson's knowledge and active cooperation), and without any consultation with any of the effected staff members, outside consultants, or anyone else. Pl.'s Facts ¶¶ 52-63, 65. It also made no sense, since there had been no duplication of functions or unnecessary positions prior to the "reorganization," it created overworked administrators, it resulted in

dramatically increasing the salaries of the building managers, and it saved little, if any, money. Pl.'s Facts ¶¶ 65-68; Pl.'s Resp. to Sch. Bd. Fact ¶ 43 (budget for the operations and maintenance department has increased since November 2001).

Further, regardless of the motivation for the so-called "reorganization," it did not include the elimination of Trombetta's job. Rather, he was fired, and Gianneschi, whose job was eliminated, was demoted and given Trombetta's position. Pl.'s Facts ¶ 65, 71. The peculiar nature of Trombetta's firing is also shown by the fact that it was admittedly a matter of personnel, and it was not considered in closed session, as were all other matters of personnel. Pl.'s Fact ¶ 69. It was, however, discussed by Manzo and Kelly, in which discussion Kelly admitted that it was being done at the behest of Serpico. Pl.'s Fact ¶ 64. Jackson, who was in on the plot to fire Trombetta, and indeed relieved him of his duties almost one week before the Board voted to get rid of Trombetta, admitted that Serpico had directed that it be done as an act of political retribution. Pl.'s Facts ¶¶ 52-53, 78.

According to William Krause, the Assistant Superintendent for Technology and Operations, and the administrator responsible for the supervision of all physical facilities and maintenance operations and personnel at District 209, Trombetta, as Building Manager at Proviso East, had no input into policies, and did not even develop a budget or allocate money. Pl.'s Fact ¶ 3. His duties were simply those of the head janitor at one of the District's two high schools. Pl.'s Fact ¶ 2.

8

## III. ARGUMENT

### A.  A REASONABLE JURY WOULD LIKELY FIND THAT DEFENDANTS' FIRING OF TROMBETTA WAS POLITICALLY MOTIVATED.

All of the defendants allege that no reasonable jury could conclude that the firing of Trombetta was politically motivated.  Sch. Bd. Mem. at 11-12; Serpico Mem. at 4-14.  To the contrary, the fact, the facts cited above constitute overwhelming evidence of defendants' political motivation.

A reasonable jury could conclude from the above facts that:  all of the individual defendants knew of Trombetta's political allegiances; Serpico, Welch, Carlson, and Kelly were politically opposed to Trombetta and bent on political retaliation against him; Adams was coerced into joining the conspiracy by Serpico's threats to fire Adams' father and rewards to Adams and his family members, Pl.'s Facts ¶¶ 21-28; and Jackson joined the conspiracy, apparently to save his own job, which was also threatened by Serpico, Pl.'s Fact ¶ 77-78.

Defendants also argue that they are entitled to prevail because they have adduced a legitimate non-political reason (the purported reorganization) for terminating Trombetta.  Sch. Bd. Brf. at 5; Serpico Brf. at 11-14.  But the *McDonnell Douglas* burden-shifting test that defendants are referring to "is inapplicable where the plaintiff presents direct evidence of discrimination," *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985); *Troupe v. May Dept. Stores Co.*, 20 F.3d 734 (7th Cir. 1994).  Indeed, "if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002).

9

Moreover, a reasonable jury could well conclude that the supposed reorganization was a sham. In order to survive summary judgment, Trombetta need only present evidence that political motivation was a substantial reason for his firing. *Simmons v. Chicago Board of Education*, 289 F.3d 488, 495 (7th Cir. 2002) ("to survive summary judgment Simmons must present evidence that his campaign against Murphy was a substantial factor in his ouster."). He has more than done so. *See also Rakovich v. Wade*, 850 F.2d 1180, 1189-90 (7th Cir. 1988) (en banc) (a plaintiff's burden is not "so burdensome that the plaintiff must show that the defendant's desire to inhibit protected conduct was the sole motive for his actions. In fact, the plaintiff need not even go so far as showing that 'a particular purpose was the "dominant" or "primary" one'" (citations omitted)). In this case, however, Trombetta will not need to resort to a mere "substantial" motivation, as politics appears to be the only motivation.

## B. A REASONABLE JURY WOULD LIKELY FIND THE EXISTENCE OF A CONSPIRACY.

Both Serpico and the School Board defendants assert that there is no evidence of a conspiracy among the defendants. School Board Mem. at 12-13; Serpico Mem. at 14-15. To the contrary, there is abundant evidence that all of the individual defendants (Mayor Serpico, School Superintendent Jackson, and School Board members Kelly, Welch, Adams, and Carlson) engaged in a conspiracy to retaliate against Trombetta for his political opposition to Serpico and his political support of Michael Manzo ("Manzo"). The retaliatory motive was admitted by all of the defendants, and they acted in secrecy to plan and carry out Trombetta's termination.

"A civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means." *Hampton v. Hanrahan*, 600 F.2d 600,

620 (7th Cir. 1979), *rev'd in part on other grounds*, 446 U.S. 654 (1980). The principal elements of the tort are an agreement between the wrongdoers and an overt act by one or more of them in furtherance of their agreement. *Hampton*, 600 F.2d at 621. "Conspiracies are by their nature carried out in secret, and thus direct proof of agreement is rare." *Tully v. Del Re*, 2002 U.S. Dist. LEXIS 18840, at *18 (N.D. Ill. Oct. 1, 2002) (Kennelly, J.). Neither direct proof of a schemer's involvement, nor evidence of an express agreement, is required. *Id; Hakim v. Outsourcing Solutions, Inc.*, 2002 U.S. Dist. LEXIS 24639, at *16 (N.D. Ill. Dec. 23, 2002) (Kennelly, J.). A jury can reasonably infer an agreement from circumstantial evidence "'coupled with commonsense knowledge of the behavior of persons in similar circumstances,'" *Hakim*, 2002 U.S. Dist. LEXIS 24639, at *16 (quoting *Adcock v. Brakegate, Ltd.*, 164 Ill.2d 54, 66 (1995)), including evidence of a relationship between the conspirators, a common motive to retaliate and the opportunity to do so. *Tully.* "[T]he question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached an understanding." *Hampton*, 600 F.2d at 621.

As shown above, *see supra* pp. 3-8, there is a mountain of evidence that Serpico and the other defendants engaged in a conspiracy to punish Trombetta and their other political enemies. This evidence is far more than that amassed in the vast majority of cases, and far exceeds that necessary to stave off summary judgment.[3]

---

[3] Serpico also claims that, "The Time Lapse Between Plaintiff's Protected Conduct and Plaintiff's Termination is Too Tenuous." Serpico Mem. at 8. Trombetta has already addressed the (non-)significance of this argument in his statement of facts. *See supra* pp. 6-7. The cases on which Serpico relies are cases in which the plaintiff had little or no evidence besides the

(continued...)

## C. THE SCHOOL BOARD IS NOT ENTITLED
## TO JUDGMENT ON THE PLEADINGS.

The School Board argues that it is entitled to judgment on the pleadings because Trombetta

supposedly has not stated a policy claim against the School Board. Sch. Bd. Mem. at 4. It refers to

¶ 27 of the First Amended Complaint, which states, "Trombetta's termination is part of a pattern,

custom, policy, and practice of defendants Kelly, Welch, Carlson, Adams, and Jackson . . . ."

This argument is silly. The School Board acts through the votes of its members. Defendants

Kelly, Welch, Carlson, and Adams comprise a majority of the seven-member School Board. First

Am. Compl. ¶¶ 16, 18-19. As such, a pattern, custom, policy, and practice of those defendants

becomes, through their block voting on the School Board, the pattern, custom, policy, and practice

of the School Board, as well.[4]

Moreover, where the School Board itself allegedly committed an unconstitutional act that

directly injured the plaintiff, there is no requirement that there be any municipal "policy" beyond that

one unconstitutional act. As the Supreme Court has explained:

_____

[3](...continued)
assertedly short time interval between the plaintiff's act and the defendant's alleged retaliation
therefor. Here, by contrast, Trombetta has powerful direct evidence of discrimination.

[4] Evidently the School Board would agree that it is not entitled to judgment on the
pleadings if Trombetta had simply substituted "the School Board" for "defendants Kelly, Welch,
Carlson, Adams, and Jackson" in paragraph 27 of the First Amended Complaint. The Federal
Rules do not require such niceties. *See Leatherman v. Tarrant County Narcotics Intelligence &
Coordination Unit*, 507 U.S. 163 (1993) (reversing dismissal of conclusory allegations of
municipal policy); *Conley v. Gibson*, 355 U.S. 41 (1957). A complaint need only "narrate a
claim, which means a grievance such as 'the City violated my rights by preventing me from
renovating my apartments.'" *Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir. 1997)
(emphasis deleted). By the same token, a claim like "the School Board violated my rights by
firing me" -- which, in brief, is Trombetta's claim against the School Board – is sufficient. There
is no requirement that Trombetta specifically allege the School Board's policy at all; *a fortiori*,
Trombetta's assertedly imprecise allegation of the School Board's policy is sufficient .

> [P]roof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

*Board of Commissioners v. Brown*, 520 U.S. 405 (1997). Even before *Monell*, the Supreme Court had repeatedly allowed section 1983 suits to proceed against school boards for their own unconstitutional acts directed at plaintiffs, *Monell v. City of New York Department of Social Services*, 436 U.S. 658, 663 & nn.5-6 (1978) – and *Monell* certainly did not signal a retreat from that precedent. Here, Trombetta alleges that the School Board terminated him, and that it did so to retaliate against him for his support of Manzo. First Am. Compl. ¶ 24. Trombetta thus has attributed unconstitutional conduct to the School Board itself and has sufficiently alleged that, "through its *deliberate* conduct, the [School Board] was the 'moving force' behind the injury alleged." *Board of Commissioners v. Brown*, 520 U.S. at 404.

### D. JACKSON IS NOT ENTITLED TO JUDGMENT ON THE PLEADINGS OR SUMMARY JUDGMENT.

Defendant Jackson contends that he is entitled to judgment on the pleadings or summary judgment. Sch. Bd. Mem. at 4(B), 5(C). Each of these "arguments" consists of just three sentences of text and is supported by no authority whatsoever. Arguments that are so "perfunctory and undeveloped" are waived, *United States v. Andreas*, 150 F.3d 766, 769 (7th Cir. 1998), and are properly disregarded by this Court, *To-Am Equipment Co. v. Mitsubishi Caterpillar Forklift America, Inc.*, 152 F.3d 658, 663 (7th Cir. 1998).

Even if the arguments had been preserved, they are meritless. Taking Jackson's "argument" for judgment on the pleadings first, it is that the "pleadings can scarcely support the heavy machinery

of the law for a Section 1983 claim." Sch. Bd. Mem. at 4. He cites no authority for this proposition, nor is it clear what he means.

If Jackson is attempting to argue that Trombetta has not sufficiently pled Jackson's personal involvement, he is mistaken. A motion for judgment on the pleadings is governed by the same generous standard as a Rule 12(b)(6) motion to dismiss. The motion should be granted only where it would be impossible for the plaintiff to prevail under any set of facts that could be proved consistent with the allegations – where it appears beyond doubt that plaintiff cannot prove any facts that would support his claim for relief.. *Forseth v. Village of Sussex*, 199 F.3d 363, 368 & n.6 (7th Cir. 2000).

Section 1983 provides in part that "every person who, under color of [law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to a constitutional deprivation," may be subjected to liability. *Ryan v. Mary Immaculate Queen Center*, 188 F.3d 857, 859 (7th Cir. 1999); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995); *Black v. Lane*, 22 F.3d 1395, 1401 (7th Cir. 1994). "[A]n official satisfies the personal responsibility requirement of section 1983 . . . if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent. . . . That is, he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Gentry*, 65 F.3d at 561 (citations and internal quotation marks omitted).

Trombetta amply alleges Jackson's personal involvement in the unconstitutional firing of Trombetta. Trombetta alleges that School Superintendent Jackson knew that Trombetta was politically aligned with Manzo and opposed to defendant Serpico, First Amended Complaint ¶ 27; that Jackson and the other School Board defendants had a policy of retaliating against defendants

14

deemed not loyal enough to Serpico, *id.*; and that Jackson and the other School Board defendants conspire to terminate Trombetta for political reasons, *id.* ¶ 20-21.

Most remarkably, Trombetta alleges that on April 12, 2002 Jackson told Trombetta that he was terminated and ordered him to return all School District 209 property in his possession. *Id.* ¶ 23. During the afternoon of April 12, 2002, Jackson summoned Trombetta to his office and informed him that he was being relieved of his responsibilities effective immediately and that he needed to turn in his identification card and keys. Pl.'s Fact ¶ 53. Jackson did this *six days before the meeting at which the School Board voted to terminate Trombetta.* First Amended Complaint ¶ 24; Pl.'s Fact ¶ 65. Jackson thus not only actively participated in the unconstitutional termination of Trombetta, but actually terminated him with no legal basis for doing so.[5] Indeed, Jackson did so before three of the seven Board members had even *heard* of any proposal to fire Trombetta or to reorganize the maintenance department. Pl.'s Fact ¶ 55.

Further, evidence developed in discovery also shows that Jackson had a central role in the School Board's vote to fire Trombetta. There was a regularly scheduled School Board meeting on April 15, 2003, the agenda for which did not mention any proposal to terminate Trombetta. Pl.'s Fact ¶ 54. A revised agenda, distributed on the date of the meeting, contained an item proposing Trombetta's termination. *Id.* Defendant Adams did not attend the meeting, and School Board member Rob Smith (a member of the Manzo bloc) arrived two hours late – which shifted the votes

---

[5] The Illinois School Code provides that a superintendent of schools, such as Jackson, only has the authority to make recommendations to the School Board concerning dismissal of employees, not to fire them himself. 105 ILCS 5/10-21.4 (2000). *See also* 105 ILCS 5/10-20, 5/10-21 (2000). But the fact that Jackson exceeded his authority when he terminated Trombetta cannot insulate him from liability under section 1983. "It is firmly established that a defendant in a section 1983 suit acts under color of state law when he abuses the position given to him by the State." *West v. Atkins*, 487 U.S. 42, 49-50 (1988).

on the School Board from a majority of Kelly supporters to a 3-3 tie between Kelly and Manzo supporters. Pl.'s Fact ¶ 59. Within minutes of Smith's arrival, Jackson, Welch, and Kelly conferred privately, whereupon Jackson announced that the meeting (which had been going on for two hours) would be postponed, purportedly because the agenda for the meeting had not been properly posted. Pl.'s Fact ¶ 60. School Board members Manzo, Baxter, and Smith had heard nothing about the purported failure to post the agenda until Jackson announced that the meeting was being been cancelled. Pl.'s Fact ¶ 61. The secretary responsible for posting the agenda has no knowledge or recollection that the April 15, 2002 meeting was not properly posted, nor has anyone ever talked to her about that. Pl.'s Fact ¶ 62. The purported failure to post the agenda was simply invented by Jackson, with direction from Kelly and Welch, to avoid a vote on Trombetta's termination, since the Kelly bloc lacked the necessary votes after Smith's arrival. Pl.'s Fact ¶ 63. The meeting was rescheduled to April 18, 2002; all four members of the Kelly bloc attended that meeting and voted to teminated Trombetta, resulting in a 4-3 vote in favor of his termination. Pl.'s Fact ¶ 65.

Jackson thus played a key role in the firing of Trombetta. He personally illegally fired Trombetta six days before the meeting at which the School Board voted to do so. Jackson also met and conspired with Kelly and Welch to concoct a bogus reason for cancelling the April 15, 2002 meeting when the Kelly bloc did not have the votes to terminate Trombetta, and announced the cancellation and rescheduling of the meeting. Jackson thus directly deprived Trombetta of his job, and also facilitated the School Board's vote to do so. This is more than sufficient to satisfy section 1983's personal responsibility requirement. *See Gentry*, 65 F.3d at 561.

Jackson is thus not entitled to judgment on the pleadings. The facts cited above also show that he is not entitled to summary judgment: there is plentiful evidence from which a jury could conclude that Jackson's involvement satisfied section 1983's personal responsibility requirement.

### E. SERPICO IS NOT ENTITLED TO JUDGMENT ON THE BASIS THAT HE LACKED THE AUTHORITY TO TERMINATE TROMBETTA.

Serpico also claims that he is entitled to summary judgment because he lacked the authority to fire Trombetta. Serpico Mem. at 1-3. While that is literally true, it in no way entitles Serpico to judgment. The record is replete with evidence that Serpico was not merely involved in the conspiracy to fire Trombetta, but was its ringleader. *See supra* pp. 3-8. Serpico hated Trombetta, to the extent that he told Everardo Villegas on election day in April 2001 that "[t]hose fucking Trombettas and those fucking Manzos are going to wish they never did what they did today because I'm coming after them," Pl.'s Fact ¶ 14, and by his own account on November 7, 2001 threatened to "break [Trombetta's] arm off and shove it up his ass." Pl.'s Fact ¶ 41.

A reasonable jury could easily find that Serpico directly caused Trombetta's firing by extorting Adams to "flip" by threatening to fire his father and other means, Pl.'s Facts ¶¶ 21-27, and conspiring with Adams and the other School Board members aligned with Serpico to fire Trombetta, *see supra* pp. 3-8. Jackson, who was also in on the plot, admitted that Serpico had directed that Trombetta be fired as an act of political retaliation. Pl.'s Fact ¶ 52-53, 78. Serpico's direct role as the ringleader of the conspiracy to fire Trombetta is amply sufficient to make him liable under section 1983. *See Ryan v. Mary Immaculate Queen Center*, 188 F.3d 857, 859 (7th Cir. 1999); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995); *Black v. Lane*, 22 F.3d 1395, 1401 (7th Cir. 1994).

### F. THE NATURE OF TROMBETTA'S POSITION WAS NOT SUCH AS TO MAKE IT APPROPRIATE TO TERMINATE HIM FOR POLITICAL REASONS.

The School Board defendants argue that the nature of Trombetta's job was such as to make it appropriate to terminate him for political reasons. Sch. Bd. Mem. at 9-10. This claim crosses the border into the frivolous. A government employee may be fired for political reasons only when "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel*, 445 U.S. 507, 518 (1980). The Seventh Circuit "has framed the inquiry as whether the position held by the individual authorizes, either directly or indirectly, meaningful input into governmental decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Kline v. Hughes*, 131 F.3d 708, 709 (7th Cir. 1997). Most jobs for which political affiliation is an appropriate qualification may be described as "policymaking" or "confidential." *Matlock v. Barnes*, 932 F.2d 658, 662 (7th Cir. 1991). "[D]efendants bear the burden of establishing that political affiliation is an appropriate qualification for the job from which the plaintiff is ousted. The public employer must demonstrate the legitimate governmental interest in discharging the employee which overrides the encroachment on the employee's First and Fourteenth Amendment rights." *Matlock*, 932 F.2d at 663.

Defendants have come nowhere near meeting that burden here. Trombetta was the Building Manager of Proviso East High School. Pl.'s Fact 1. In that position, his job assignments and duties included:

    (a)     assuring that the facilities and grounds were clean and well-maintained;

    (b)     distributing daily work schedules for maintenance staff;

    (c)     maintaining a daily log of maintenance work assigned and completed;

    (d)     evaluating subordinate maintenance employees and submitting such evaluations to the Director of Facilities;

    (e)     investigating options for use of contract maintenance services and reporting such

18

information to the Director of Facilities;

(f)    developing and submitting to the Director of Facilities lists of necessary maintenance materials and supplies;

(g)    notifying his supervisor if a condition warranted evaluation or if there were problems with an employee; and

(h)    performing any other tasks requested or assigned by his supervisors.

Pl.'s Fact ¶ 2. As Building Manager of Proviso East, Trombetta had no input into School District 209 policies, and never developed a budget or allocated money. Pl.'s Fact ¶ 3.

Trombetta was one of two Building Managers in School District 209. Pl.'s Fact ¶ 68. He reported to Assistant Director of Facilities Larry Simone and Director of Facilities Fred Gianneschi. *Id.* Simone and Gianneschi reported to Assistant Superintendent of Technology and Operations William Krause, *id.*, who was responsible for the supervision of all physical facilities and maintenance in District 209, Pl.'s Fact ¶ 3. Krause reported to Superintendent of Schools Greg Jackson. Pl.'s Fact ¶ 68.

Trombetta's list of responsibilities make clear that he was essentially a head janitor. Not surprisingly, defendants are unable to cite any case in which a janitorial or maintenance position was found to be one in which political loyalty is an acceptable prerequisite for the job. In *Parish v. Pahs*, 872 F. Supp. 562 (N.D. Ind. 1995), where the court stated, "There is *of course* no claim by the defendants that the plaintiff, a janitor, would qualify as a policy maker or confidential employee." *Id.* at 564 n.2. In *Soderbeck v. Burnett County*, 752 F.2d 285 (7th Cir. 1985), the court held that whether a sheriff could fire the wife of the former sheriff he had defeated, whose title was "bookkeeper" and who also typed, handled legal papers such as summons and warrants, did janitorial work, and performed domestic chores for prisoners, presented a jury question. But it only presented

a jury question on the issue of whether her position was a "confidential" one; there was no contention that she was a policymaker.

Whichever of the various tests is applied, there is no plausible argument that a janitorial or maintenance employee with no budgetary responsibilities falls within the category of employees for which political affiliation is a permissible basis for discharge. Defendants have not demonstrated (or even argued) that political allegiance "is an appropriate requirement for the effective performance," *Branti*, 445 U.S. at 518, of the position of Building Manager. Nor does either the job description or the testimony indicate that the position of Building Manager "authorizes, either directly or indirectly, meaningful input into governmental decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Kline*, 131 F.3d at 709. There is no claim that Building Manager was a "confidential" position, nor can the job reasonably be claimed to involve "policymaking."

A job that is ministerial or menial is not one for which political affiliation is a permissible basis for discharge. *Matlock*, 932 F.2d at 664. "[A] state may not prefer Republican road crews over Democratic ones." *Feldman v. Ho*, 171 F.3d 494, 496 (7th Cir. 1999) (dictum). *See Elrod v. Burns*, 427 U.S. 347 (1976) (positions of process server, clerk, and bailiff/security guard were not jobs for which political affiliation was an appropriate requirement); *Matlock*, 932 F.2d 658 (defendants failed to show that legal investigator job was one for which political affiliation was an appropriate requirement); *Soderbeck*, 752 F.2d 285 (defendants did not contend that bookkeeper who also typed, handled legal papers, did janitorial work, and performed domestic chores for prisoners was a policymaking position, although whether it was "confidential" presented a jury question); *Mitchell v. Randolph*, 155 F. Supp. 1057, 1064 (N.D. Ind. 2001) (job whose duties including answering the

phones, processing warrants, filing, contacting social service agencies for inmates, and scheduling mock courts along with court administrator and judge was not one for which political affiliation was an appropriate requirement).

The only basis the School Board defendants proffer for claiming that they could fire Trombetta for political reasons is that his job description assertedly included "assist[ing] in developing maintenance objectives, policies and procedures" and "[r]ecommend[ing] the appointment, transfer, promotion and termination of subordinate maintenance and custodial personnel." Sch. Bd. Mem. at 10. Patricia Imburgia, the Director of Human Resources of School District 209, testified that the document does not even look like a job description from District 209. Pl.'s Resp. to Sch. Bd. Statement of Material Facts ¶ 18.

Even if the document were authentic, however, the two sentence fragments the School Board defendants quote would not entitle them to summary judgment. Without further evidence, which defendants do not offer, it is impossible to determine the significance *vel non* of these alleged responsibilities. A Building Manager's role in "assist[ing] in developing maintenance objectives, policies and procedures" could just mean that he assists in determining how often to vacuum the carpeting and mop the floors, and what cleaning products to use. Indeed, Welch's testimony is consistent with this. Asks to explain his contention that Trombetta was a policymaker, Welch explained that Trombetta "dictated to the custodians on a daily basis, where to punch, check in, where not to check in, what rooms to clean at a certain time." Welch Dep. 163. Nor does the ability to recommend the appointment, transfer, promotion, and termination of subordinate personnel prove that political affiliation is a proper criterion for the position of Building Manager. Merely being able to express an opinion (which his superiors are free to accept or reject) that a particular candidate has

21

appropriate experience, or that a subordinate is doing a good or bad job is part of the job of any supervisor, and it does not make political affiliation an appropriate criterion for a job. Notably, the purported job description expressly states that even in these areas Trombetta's only role is to "assist" or make a recommendation to the actual decisionmaker. *Cf. Tomczak v. City of Chicago*, 765 F.2d 633, 641-42 (7th Cir. 1985) (plaintiff was in charge of administering City Bureau of Water Distribution, with 1,150 employees and $40,000,000 annual budget; he spent 30% of his time planning, developing, and recommending Bureau's budgetary requirements, and 10% of his time developing, coordinating, and controlling Bureau's activities to achieve its short- and long-range goals).

### G. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON TROMBETTA'S CLAIM THAT HE WAS FIRED FOR SPEAKING OUT ON AN ISSUE OF PUBLIC CONCERN.

In addition to contending that he was fired for his political affiliation, Trombetta contends in the alternative that he was fired for speaking out on an issue of public concern, namely the School Board's decision to investigate a five-year-old child for purportedly attending school outside of the elementary school district in which she resided. *See* Pl.'s Facts ¶¶ 49-51. The School Board defendants also contend that they are entitled to summary judgment on this claim. Sch. Bd. Mem. at 7-9. They are wrong.

Whether an employee's speech deserves First Amendment protection is evaluated under the two-part test established in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Connick v. Myers*, 461 U.S. 138 (1983). *Wainscott v. Henry*, 315 F.3d 844, 848 (7th Cir. 2003). "This analysis requires us first to determine whether the employee spoke as a citizen upon matters of public concern. If the speech addresses a matter of public concern, we will balance the employee's interest

22

in commenting upon such matters and the employer's interest in efficient public services." *Id.* (citations to *Connick* and *Pickering* omitted). "The burden of showing that the government's interests outweighed the plaintiff's falls on the defendant." *Coady v. Steil*, 187 F.3d 727, 732 (1999).

Determination of whether the employee's statement dealt with a matter of public concern requires consideration of the content, form, and context of the statement as revealed by the whole record. *Wainscott*, 315 F.3d at 849. Of these, content is the most important. *Id.* Speech is directed at a matter of public concern if it relates to any matter of political, social, or other concern to the community, but not if it involves a personal grievance of interest only to the employee. *Id.*

The agenda of the School Board's March 18, 2002 meeting contained an item asking the Board to consider directing the law firm of Odelson & Sterk to investigate an allegation that Manzo was illegally sending his 5-year-old daughter to kindergarten in a school district in which he did not reside, and to issue a report to be sent to "School District 93, School District 89, the Cook County State's Attorney's office, and to the Regional Superintendent of schools." Pl.'s Fact. 49. Trombetta spoke at the March 18, 2002 meeting, which was open to the public. Pl.'s Fact 50.

Trombetta's speech was a classic example of speech on an issue of public concern. He identified himself as a "taxpayer"; asked why District 209 found it necessary to investigate a five-year-old, and why the District, a high school district, would investigate a matter pertaining to a grade school district; and asked who was going to pay the costs of the investigation. Pl.'s Fact 50. Trombetta added that he thought the matter brought negativity to District 209 and that the Board should focus on its students and teachers instead. *Id.* His speech was not couched in terms of his personal concerns, or even Manzo's, but in terms of why the taxpayers should pay for an investigation that had nothing to do with the District, rather than focusing on issues of concern to

the students and teachers of the District. He sought to dissuade the Board from an obviously politically motivated investigation that had nothing to do with the Board's own legitimate interests.[6] As the Seventh Circuit emphasized in *Wainscott*:

> Whether the [District] is run in an efficient and effective manner is clearly an important matter of public concern. An employee's ability to highlight the misuse of public funds or breaches of public trust is a critical weapon in the fight against government corruption and inefficiency. We would be remiss not to protect an employee's ability to expose such things.

315 F.3d at 849 (citation omitted).

The context of the speech here is also significant. Trombetta did not speak on the job, like the plaintiff in *Wainscott*, but after hours, at a public School Board meeting. The very purpose of having such meetings open to the public is to allow public input and discussion into the School Board's deliberative processes. Trombetta alleges, and a reasonable jury could find, that defendants, far from welcoming his comments as it should have, fired him for making them.[7] Speech uttered on the job may distract the speaker and other employees, and may in some cases disrupt the workplace. As such, it will be entitled to less protection in some cases. No such considerations apply here, where the speech was outside of the workplace and in a setting where speech is invited and should be welcomed, not punished.

Having determined that Trombetta spoke on an issue of public concern, we must next "balance the employee's interest in commenting upon such matters and the employer's interest in

---

[6] If the School Board members were genuinely concerned about a possible fraud on elementary School District 93, rather than trying to smear Manzo, they could have addressed those concerns by notifying School District 93, rather than spending taxpayer dollars to pay a law firm to investigate a matter that had nothing to do with School District 209.

[7] Defendant Jackson thought that Trombetta's comments put his job in peril and asked him after the meeting why he had spoken and whether he wanted to get fired. Pl.'s Fact ¶ 51.

efficient public services." The employee's interest has already been addressed – Trombetta should have the same right as any other taxpayer to speak at a public School Board meeting without fear of reprisal.

Remarkably, the School Board defendants have *nothing* to say about this prong of the test. They do not deny that Trombetta has a First Amendment right to speak out. And (unlike in *Wainscott*) they make no argument that Trombetta's speech disrupted his workplace, or that there was any other legitimate basis for their ruthless punishment of Trombetta. *See* Sch. Bd. Mem. at 7-9.

The Seventh Circuit in *Wainscott* affirmed the grant of summary judgment in favor of the *plaintiff.* This is a stronger case for the plaintiff than *Wainscott*, given that, unlike in that case, (1) Trombetta's speech took place after hours, (2) in a forum specifically designed for public commentary and debate, and (3) the employer makes no argument that Trombetta's speech disrupted the workplace. Defendants' argument that they are entitled to summary judgment on this claim is thus baseless.

## H. THE INDIVIDUAL SCHOOL BOARD MEMBERS ARE NOT ENTITLED TO LEGISLATIVE IMMUNITY.

Defendants Kelly, Welsh, Carlson, and Adams contend that they are entitled to legislative immunity. Sch. Bd. Mem. at 5-6. This contention is refuted by *Acevedo-Garcia v. Vera-Monroig*, 204 F.3d 1 (1st Cir. 2000), one of the principal cases upon which they rely. Sch. Bd. Mem. at 6. As the court explained in *Acevedo-Garcia*, "Absolute immunity applies to prospective, legislative-type rules that are general in nature. Employment decisions generally are administrative except when they are accomplished through traditional legislative functions such as policymaking and budgetary restructuring that strike at the heart of the legislative process." 204 F.3d at 8 (citation and internal

quotation marks omitted). "The administrative or executive actions of legislators are not entitled to protection." *Id.*

The Seventh Circuit has likewise stated that:

> [E]mployment decisions generally are administrative, regardless of whether made by a judge or a legislature. *See, e.g., Forrester [v. White]*, 484 U.S. 219 [1988] (no judicial immunity for firing of probation officer by judge because of sex); *Davis v. Passman*, 442 U.S. 228 (1979) (no legislative immunity for member of Congress for firing of staff employee because of sex).

*Rateree v. Rockett*, 852 F.3d 946, 950 (7th Cir. 1988).

The court in *Acevedo-Garcia* enunciated a two-part test to determine whether an act is legislative or administrative:

> First, if the facts underlying the decision are generalizations concerning a policy or state of affairs, the decision is legislative. If the decision stems from specific facts relating to particular individuals or situations, the act is administrative. Second, the court must consider the particularity of the impact of the state of action. If the action involves establishment of a general policy, it is legislative; if it singles out specifiable individuals and affects them differently than others, it is administrative.

*Acevedo-Garcia*, 204 F.3d at 9 (citations omitted).

The First Circuit applied this test to determine whether layoffs of employees in Adjuntas, Puerto Rico, which had purportedly been undertaken for budgetary reasons, were protected by legislative immunity. The court found that the layoffs were not protected by legislative immunity because they had been implemented in a political manner. 204 F.3d at 8 (defendants' acts "did not 'reach well beyond the particular occupant of the office,' but instead targeted specific individuals affiliated with the" opposition party), 9 ("the defendants' implementation of the layoff plan targeted specific individuals").

26

The same analysis applies here. Notably, this is *not* a case like *Rateree*, where "the plaintiffs' positions were eliminated altogether and no one was hired to replace them." 852 F.2d at 950. Rather, the positions of the two superiors to whom Trombetta reported – Director of Facilities Fred Gianneschi and Assistant Director of Facilies Larry Simone – were eliminated. Pl.'s Facts ¶¶ 65-67, Trombetta's position and that of the other Building Manager were retained, yet Trombetta was fired.

Nothing about the "reorganization" looks like a normal budgetary reorganization. As set forth above, *see supra* pp. 7-8, the defendants had long been plotting to fire Trombetta; kept their plans secret from their fellow School Board members; illegally and dishonestly manipulated the scheduling of the Board meeting to ensure they had the necessary votes; did not consult Superintendent Jackson, the affected staff members, outside consultants, or anyone else about the "reorganization"; saved little or no money as a result of the reorganization; and despite demoting Gianneschi and Simone (who had higher salaries than Trombetta), did not decrease their salaries. Pl.'s Facts ¶¶ 65-67. Welch admitted that the firing of Trombetta was a **personnel matter,** not a budgetary matter, and the agenda of the meeting also reflects this. Pl.'s Fact 69.

The defendants' actions thus specifically and blatantly targeted Trombetta for elimination, even though his position was not eliminated. As such, *Acevedo-Garcia* establishes that the firing of Trombetta was an administrative act, not a legislative one, so legislative immunity does not apply.

## I. THE INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

The School Board defendants assert that they are entitled to qualified immunity. Sch. Bd. Mem. at 6-7. However, their discussion of qualified immunity consists solely of a general discussion

of the standards therefor. *Id.* They never advance any argument that they are entitled to qualified immunity on any of Trombetta's claims.

The Court should thus rejected the School Board defendants' wholly unsupported claim that they are entitled to qualified immunity. In any event, even if they had articulated such a claim, it would fail. It is clearly established that it is unconstitutional to engage in a conspiracy to fire an employee for his political affiliation; to fire an employee for his political affiliation (absent a showing that he is a policymaking or confidential employee, which defendants have made no meaningful effort to make); and to fire an employee for speaking out, as a taxpayer, on wasteful expenditures of school funds. Defendants make no legal argument to the contrary; they merely argue that they have not done any of those things. As Trombetta has shown, a reasonable jury could easily conclude otherwise. The defendants are thus not entitled to qualified immunity.

## J. PUNITIVE DAMAGES AND INJUNCTIVE RELIEF ARE PERMISSIBLE REMEDIES.

The School Board defendants argue that punitive damages and injunctive relief may not be awarded. Sch. Bd. Mem. at 13-14. They are mistaken on both counts.

Punitive damages may be awarded in a section 1983 case "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). A jury could easily find that the individual defendants' actions, as detailed in the statement of facts, meet this standard.

28

The defendants' assertion that plaintiff is not entitled to equitable relief is also wrong.[8]  In

*Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 460 (1975), the Supreme Court found, in

the closely analogous context of a section 1981 case, that "[a]n individual who establishes a cause

of action under § 1981 is entitled to both equitable and legal relief, including compensatory and . .

. punitive damages." *See also Squires v. Bonser,* 54 F.3d 168, 171 (3rd Cir. 1995) (a plaintiff suing

under § 1983 may seek reinstatement as an equitable remedy in an unconstitutional discharge case);

*Knoski v. Gainer,* 1998 U.S. Dist. LEXIS 299, at *10 (N.D. Ill. Jan. 15, 1998) (awarding back pay

and reinstatement after finding in favor of plaintiff on § 1981 and Title VII claims).

---

[8]  The only case defendants cite for this proposition, *Classic Components Supply, Inc. v. Mitsubishi Electronics America, Inc.,* 841 F.2d 163 (7th Cir. 1988), has no bearing on this question.  It is a breach of contract case based on diversity jurisdiction, not an employment case. Moreover, the issue in that case was whether the court would grant an injunction pending appeal. It sheds no light on whether or to what extent injunctive relief is available in an employment case.

## CONCLUSION

For all of the reasons stated above, the defendants' motions for summary judgment and motion for judgment on the pleadings, except as they pertain to Count III of the First Amended Complaint, should be denied in their entirety.

Respectfully submitted,

_____
One of Plaintiffs' Attorneys

Matthew J. Piers
Frederick S. Rhine
Juliet V. Berger-White
**Gessler Hughes Socol Piers Resnick & Dym, Ltd.**
Three First National Plaza
Suite 4000
Chicago, Illinois 60602
(312) 580-0100
*Attorneys for Plaintiff*

October 2, 2003

30